IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 26, 2002 Session

## LEONARD HUTCHISON AND JAMES HARPER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**Nos. 33993, 35138, 36742, 50214    Richard R. Baumgartner, Judge**

**No. E2001-02737-CCA-R3-PC**
**March 26, 2003**

The post-conviction court granted each of the petitioners post-conviction relief on the grounds that the state had violated the requirements of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by failing to disclose an exculpatory FBI laboratory report and an exculpatory witness statement. In this appeal of right, the state contends (1) that Harper's petition is barred by the applicable statute of limitations; (2) that the trial court erred by permitting the petitioners to amend their petitions and allege new grounds after a remand from this court; (3) that the trial court erred by determining that the state suppressed the FBI laboratory reports and a witness statement; and (4) that Hutchison received the effective assistance of counsel at trial, an alternative ground for relief asserted by Hutchison. In response to the state's appeal, the petitioners assert that the trial court erred by excluding from evidence the affidavit of a juror which would demonstrate that the FBI lab reports would have created reasonable doubt. The judgment is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; and John A. Bobo, Jr., Attorney General Pro Tem, for the appellant, State of Tennessee.

Mark E. Stephens, District Public Defender (on appeal), and Robert C. Edwards, Assistant District Public Defender (on appeal and at trial), for the appellee, Leonard Hutchison.

J. Liddell Kirk, Knoxville, Tennessee, for the appellee, James Harper.

**OPINION**

In 1983, the petitioners were indicted for burglary of an automobile and felonious assault. By a separate indictment, Hutchison was also charged with possession of burglary tools. The petitioners were first tried for the offenses in December of 1984. Each presented an alibi defense. After an eight-day trial, the jury convicted Hutchison of possession of burglary tools. The remaining counts ended in a mistrial. The trial court ordered a Range II sentence of ten years for Hutchison, who was classified as a persistent offender. On direct appeal, this court affirmed the judgment. See State v. Leonard D. Hutchison, No. 1028 (Tenn. Crim. App., at Knoxville, July 23, 1987).

In the fall of 1985, the state retried the petitioners on the burglary and assault charges. The proof at trial was that in the early morning hours of September 2, 1982, the victim, James David Comer, was awakened by a tapping noise and proceeded to investigate. By shining a hunter's lantern into the parking lot of his apartment complex, he observed two men, later identified as the petitioners, in another tenant's vehicle. When the suspects fled on foot, the victim telephoned 911 and, without waiting for a response, ran to his car. While driving past the burglarized vehicle, the victim observed that the windows were fogged and that the "o" ring had been knocked off of the ignition switch. He then drove around the apartment complex looking for the suspects. Upon reentering the parking lot, the victim observed the same two men approaching from the opposite direction in "an old type racing car with red primer paint." After forcing the petitioners' car to the curb, the victim stepped out of his vehicle and informed the occupants that he had already telephoned the police. At that point, the driver, later identified as Hutchison, "gunned" the engine of his car, causing the victim to jump back and roll across the trunk of his own vehicle. During the confrontation, the victim, who was himself armed with a gun, was shot three times. Upon convictions of burglary and assault with the intent to commit second degree murder, the trial court ordered consecutive sentences for Hutchison of ten years for the burglary and fifteen years for the assault. It sentenced Harper to concurrent terms of five years for the burglary and three years for the assault. On direct appeal, this court affirmed each of the convictions. State v. Harper, 753 S.W.2d 360 (Tenn. Crim. App. 1987).

Initially, on August 29, 1988, in case number 33993, Hutchison filed a petition for post-conviction relief as to his conviction for possession of burglary tools. The petition, which alleged ineffective assistance of trial counsel, was later amended to include a claim that the state had withheld evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Later, on April 20, 1989, Hutchison filed a post-conviction petition seeking relief from his convictions for burglary and assault in case number 36742.[1] Almost four years later, on January 21, 1993, Harper filed for post-conviction relief in case number 50214. In early 1996, the post-conviction court granted relief, concluding that the state had violated the ruling in Brady by failing to timely notify the petitioners

---

[1]On December 7, 1988, in case number 35138, Hutchison filed a petition seeking post-conviction relief from February 8, 1983, convictions for grand larceny and temporary use in connection with the theft of a Corvette. Although this case is included in the caption of the notice of appeal filed in this court, there is no evidence related to these convictions in the record. Likewise, there are no findings by the trial court relative thereto and the parties do not make any arguments in connection therewith on appeal.

about an exculpatory witness from the FBI. After an appeal by the state, this court summarized the relevant facts as follows:

> The convictions . . ., however, are only the beginning of the story. At some point prior to the first trial, the defendants became aware that a person named Tommy McClanahan had information that might exculpate them. The record indicates that on February 6, 1984, Harper's attorney moved for a continuance in order to locate and interview McClanahan. McClanahan did not testify, but during Harper's testimony at the first trial, Harper blurted out that "Billy Hall" was the "shooter." At the post-conviction hearing, Hutchison testified that at some point, probably between the first and second trial, he was visited by two F.B.I. agents who told him that they had information indicating that Billy Hall and someone else had actually committed the burglary and the assault. Both defense counsel and the prosecutor testified that the defense had subpoenaed Billy Hall and that he was present throughout the second trial. The state paraded Hall before the jury at one point, but he was never placed on the stand. Hutchison's counsel at the second trial had Tommy McClanahan hidden in his office, and he intended to use McClanahan to impeach Hall's testimony. The plan fell apart, however, when McClanahan disappeared on the last day of the trial.

> In October, 1985, while the defendants were awaiting sentencing [after their second trial], Richard O'Rear, a supervisor in the Knoxville F.B.I. office, visited Hutchison at Hutchison's request. As a result of this meeting, O'Rear met with Agent Clyde Merryman who had worked in an undercover investigation of East Tennessee auto theft rings in 1982. He told O'Rear that on September 2, 1982, he and Agent Joe Mann had, as part of their undercover activities, spoken with Paul Allen, who ran a "chop-shop" in Newport, and Tommy McClanahan, who also was involved in car theft activity. In separate conversations, McClanahan and Allen told them that Billy Hall admitted that he was the man who shot James David Comer. According to the agents, Hall brought his primer-covered 1968 Pontiac to Allen to be "chopped" because it might be identified. Hall allegedly pointed out a bullet hole in the car. Neither McClanahan nor Allen knew the true identity of the agents, and Merryman and Mann found their information to be highly credible. However, since they were operating deep undercover, they decided to call another agent, Rex Owenby, who had contacts within the Knoxville Police Department and give him the information. Contrary to F.B.I. procedure, no one made a written record of this information.

> After meeting with Hutchison, O'Rear asked Merryman to interview McClanahan and Allen again. At the second interviews, both Allen and McClanahan knew that Merryman was an F.B.I. agent but both men told substantially the same story as they had in 1982. Merryman then memorialized the interviews on what are known in F.B.I. parlance as "302 forms." As a result of these interviews, O'Rear sent a letter to the Knox County District Attorney General on January 9, 1986 advising

him that the F.B.I. had information that tended to exculpate Hutchison and Harper. He forwarded copies of the 302 forms a month later. Shortly after McClanahan passed a polygraph test on August 24, 1986, the district attorney's office notified Doug Trant, Hutchison's attorney, that the F.B.I. had information concerning the crime for which Hutchison and Harper had been convicted.

Based on the conversations he had with representatives of the district attorney general's office and the F.B.I., Trant filed a Motion to Reopen on Hutchison's behalf on August 26, 1987. The motion was withdrawn without prejudice and then refiled on March 2, 1989. Judge Randy Nichols denied the motion that same day because it contained no affidavits from the alleged witnesses. Meanwhile, Hutchison began writing letters to obtain the F.B.I. documents under the Freedom of Information Act, and he filed petitions for post-conviction relief in each of his convictions alleging both ineffective assistance of counsel and Brady violations. James Harper filed a petition for post-conviction relief on January 21, 1993, alleging only that the state had violated Brady. Ultimately, the petitions were consolidated before a single judge and an evidentiary hearing was held on Feb. 1 and 2, 1995. The post-conviction court took the case under advisement and granted the petitions on January 22, 1996. On February 12, 1996, the judge entered an amended Memorandum Opinion for record-keeping purposes.

Leonard D. Hutchison and James Harper v. State, No. 03C01-9606-CR-00232, slip op. at 4-7 (Tenn. Crim. App., at Knoxville, Dec. 23, 1997).

Upon reviewing the factual and procedural history of the case, this court determined that Harper's petition was time-barred and that his claim regarding exculpatory information possessed by FBI agents was not "later arising." The record was inadequate, however, for a determination of whether Harper's claim regarding the exculpatory lab reports was still viable. The case was remanded with instructions to determine whether the lab reports issue was later arising and whether a strict application of the statute of limitations would effectively deny Harper a reasonable opportunity to present his claim. Hutchison and Harper, No. 03C01-9606-CR-00232, slip op. at 11-12.

As to Hutchison's claims on appeal, this court reversed the post-conviction court's grant of relief, holding that the state had no duty to disclose the exculpatory witness information from the FBI because the prosecution "had no knowledge of the information's existence and the [FBI] was not involved in the investigation or preparation of the case." Id., slip op. at 13-14. Again, the record was inadequate for consideration of the lab report issue. Because the post-conviction court had made no factual findings on the question, this court ordered it to "resolve the conflicting evidence, determine whether the state withheld the [lab] reports, and when the defense actually received copies of them." Id., slip op. at 18. This court also instructed the post-conviction court to rule upon Hutchison's claim of ineffective assistance of counsel.

-4-

On August 11, 1999, after remand to the post-conviction court, the petitioners attempted to amend their petitions to include the following allegations:

1.     That on April 15, 1999, . . . Leonard Hutchison was allowed to review the prosecutor's file in this cause . . . subsequent to a request . . . under the Tennessee Freedom of Information Act . . . . During that review, [Hutchison] discovered a statement of Gail Comer Pierce . . . taken by Knox Police Department Detective Jim Morris on or about September 1, 1982. The petitioner alleges that this statement is extremely exculpatory in nature . . . . Despite appropriate requests on the part of counsel representing the petitioner at the time of the trial, this information was not made known or otherwise provided to the defense in this cause . . . in violation of . . . Tennessee Rule of Criminal Procedure 16 and Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Agurs, 427 U.S. 97 (1976). . . .

2.     During the same review of the file . . . [Hutchison] also discovered written material stating that the Tennessee Bureau of Investigation . . . apparently ordered ballistics [testing] to be conducted on firearms. The petitioner does not know what firearms were tested nor what the results of the ballistic testing were. . . . If the TBI has conducted such ballistic studies, it is highly possible if not probable that the results . . . constitute exculpatory information. Furthermore, the prosecution has never furnished to the defense access to the results of the TBI reports, instead opting to provide oral explanations to [Hutchison's] then counsel . . . . Petitioner avers that it is inappropriate for the State to continue to attempt to reveal information in this fashion and that production of the full reports of the TBI should be ordered and that the petitioner should be allowed the opportunity to present this as exculpatory information on his behalf at the hearing in this cause.

The state objected to the amendments, arguing, among other things, that they were beyond the scope of the court's remand. On March 1, 2000, the post-conviction court permitted the amendment, ordering that "the ballistics examination and statement of Gail Comer Pierce are appropriate issues for this [p]ost-[c]onviction proceeding and should be considered at the [hearing]."

At the hearing, held on December 1, 2000, Attorney Doug Trant, who represented Hutchison at the second trial, testified that one of the defense theories was that the victim, a pharmacist, had been dispensing drugs without prescriptions and had been shot by his cousin as the result of a related dispute. He recalled that he attempted to introduce evidence at trial of the Board of Pharmacy's disciplinary actions against the victim, but was unsuccessful. Attorney Trant stated that he filed a motion for discovery prior to the second trial and that the state responded that there was no new material to report. It was his recollection that the state did not offer him open-file access. Attorney Trant testified that he neither heard of Gail Comer Pierce, the downstairs neighbor of the victim at the time of the offenses, nor saw her statement prior to trial. It was his opinion that her statement,

in which she reported having heard someone outside her window say, "You Mother F**ker, I'm going to shoot you," supported the defense theory that the victim knew the shooter and that the shooting was the result of a drug dispute. Attorney Trant also contended that the Pierce statement would have assisted his efforts to introduce the Board of Pharmacy disciplinary actions against the victim. He expressed the view that because the contents of the Gail Comer Pierce interview were exculpatory, it should have been produced by the state prior to trial pursuant to the rule in Brady.

Attorney Trant stated that he had not previously seen the request sent by Knoxville Police Department Specialist Arthur Bohanon to the TBI crime laboratory for comparison of Billy Hall's two pistols with the bullets and bullet fragments found by police after the assault. The request was dated December 7, 1984, during the period between the petitioners' two trials. Attorney Trant testified that he was not aware of the state's ballistics testing on Hall's guns prior to the second trial, but would have considered it "significant" information. He maintained that he would have "moved to continue this matter until we could resolve all of that testing and be satisfied where the testing led." Attorney Trant also stated that had he known of the ballistics testing, he would have sought independent testing of the burglary tools recovered from Billy Hall.

Sheriff David Davenport of Jefferson County, who was employed by the TBI at the time of the crimes, testified that after the district attorney had requested an examination of a pistol seized from Billy Hall, testing indicated that the weapon was not used in the shooting of the victim. Sheriff Davenport stated that he had no knowledge of burglary tools having been seized from either Hall or Hutchison. He concluded his investigation with a June 15, 1987, memorandum to the district attorney general in which he stated that "[n]o physical evidence could be developed which either proved or disproved Hutchison's or Hall's admission to being involved in the shooting." The sheriff, who at the time had no knowledge of earlier charges against Hall for possession of burglary tools, was unable to substantiate Hall's claimed involvement in the offenses.

Ray Shirley, who represented Harper at the second trial, recalled that he was hired in mid-July and that his motion for continuance of the October trial date was denied. Attorney Shirley, who filed a discovery motion, including a request for exculpatory information, confirmed that he was not provided with either the statement of Gail Comer Pierce or the FBI laboratory report which established that the burglary tools seized from Hutchison were not used in the commission of the offenses. He recalled that there were alternative theories of defense: (1) that the shooting had been committed by Robert Comer over a drug dispute with the victim, and (2) that the crimes had been committed by Billy Hall. Attorney Shirley testified that he first saw the Pierce statement in April of 2000. He described the statement as "very significant" and stated that he "would have definitely contacted Ms. Pierce . . . and called her as a witness."

Attorney Shirley contended that the state introduced Hutchison's burglary tools at the second trial to imply that they were used by the petitioners during the offenses. He testified that he was unaware that any of those tools had been sent to the FBI for testing or that there were written laboratory reports. Other than the transcripts of the first trial, Attorney Shirley received little paperwork from the attorney who represented Harper in the first trial. At the time of the second trial,

he had no recollection of any lab reports relative to Hutchison's burglary tools and pointed out that if he had, he would have used them as "exculpatory evidence." Attorney Shirley testified that he first became aware of the existence of the lab reports in January of 1993, after Hutchison had obtained copies through Freedom of Information Act requests. He recalled that he and Harper visited Hutchison in prison to view the reports as well as the FBI 302 documents implicating Billy Hall. Afterward, he filed the petition for post-conviction relief on behalf of Harper.

Attorney Shirley conceded that he did not meet with Harper's former counsel and acknowledged that he had entered into a stipulation with the state regarding the FBI burglary tool lab reports. He could not recall any of its terms, explaining that he did not see the reports prior to agreeing to the stipulation:

> It would be the usual practice, and that is the better practice to be able to review a report before you stipulate to it. But, in this instance, I didn't have those reports, didn't have time to get them, or review them, and I had very little time to prepare. I think I basically had a weekend to get ready for this case.

Attorney Shirley testified that he did not discuss this case with Attorney Trant between 1988 and 1993 and had no knowledge of the motions for new trial filed on behalf of Hutchison. He explained that he did not discuss the possibility of a post-conviction petition with Harper prior to meeting Hutchison in prison because he did not believe that there were any grounds for relief.

Gail Comer Pierce testified that at the time of the offenses, she lived on the ground floor of her apartment complex, one floor directly beneath the victim, who was her cousin. She confirmed that she gave a signed statement to the police.

James Harper testified that Hutchison told him of Gail Comer Pierce's statement in the spring of 2000. He learned of the FBI lab reports on Hutchison's burglary tools in January of 1993. During cross-examination, he acknowledged that the FBI agent who tested the burglary tools had actually testified at the first trial in 1984.

Mike Dixon, who as an assistant district attorney had prosecuted the petitioners at the first trial and was a special prosecutor hired by the victim's family at the second trial, testified that it was his common practice to respond to discovery by opening his files for inspection and copying by defense attorneys. Although he had no specific memory of giving the petitioners' first trial attorneys access to his file, Attorney Dixon contended that he would have made it available in its entirety had it been requested. It was his opinion that the defense attorneys involved in the first trial had been effective in their representation. Attorney Dixon explained that because he was not employed by the district attorney's office at the time of the second trial, Assistant District Attorney David Jennings, who was assigned to the case, would have handled any discovery request. He stated that Billy Hall, who apparently bore a physical resemblance to Hutchison, was present during the second trial to refute a possible defense of mistaken identity which had been raised during the first trial. Attorney Dixon had no specific recollection of having provided the FBI burglary tool lab reports to opposing

counsel but did assert that because the FBI expert had testified during the first trial, his laboratory reports were "fair game" to the defense. He conceded, however, that "by the time the second trial came around, [he] didn't have the DA's file anymore, and there may have been some things that developed between trial one and trial two that were not in the file when [he] first had it."

Attorney Dixon recalled that just after the jury was sworn, Attorney Trant had successfully challenged the indictment, lowering Hutchison's potential exposure from a possible sentence of life to only five years. He described the performance of the petitioners' attorneys at the second trial as "excellent" but had only a "vague recollection" of a stipulation regarding the FBI lab reports. He did recall that the stipulation was an effort to "wade through all that inconclusive evidence." Attorney Dixon had no independent recollection of the statement of Gail Comer Pierce, which he characterized as "neutral," but agreed that it looked "vaguely familiar." Dixon testified that the report was something that would originally have been in the district attorney's office investigative file, which would have been made available to defense counsel in conjunction with the first trial. He had no independent recollection of any ballistics testing or reports, but stated that he would have given the ballistics report on the gun reportedly seized from Billy Hall to defense counsel if it had been in his possession. He had no recollection of anyone seeking discovery from him in preparation for the second trial.

Finally, David Jennings, an assistant district attorney at the time of the second trial, testified that he acted as "second chair" when Attorney Dixon was retained as a special prosecutor. He confirmed that Attorney Dixon generally utilized an open-file discovery policy and that while he did not have such a policy, "discovery was never an issue once [he] was assigned to the case." As to the stipulation of the lab reports at the second trial, Jennings observed that, "[Y]ou will never convince me that Doug Trant or Ray Shirley would have entered into a stipulation and not have had that report." He testified that he had not previously seen the statement of Gail Comer Pierce and had no recollection of any ballistics testing.

I

Initially, the state asserts that the trial court erred by determining on remand that Harper's Brady claim regarding the FBI laboratory reports on Hutchison's burglary tools was not barred by the statute of limitations. It argues that the claim does not qualify as "later arising," as is authorized by case law to be heard beyond the statute of limitations, and that a strict application of the statute of limitations would not deny Harper a reasonable opportunity to present the issue.

As this court has previously determined, the three-year statute of limitations applicable to Harper's post-conviction petition, which was filed on January 21, 1993, expired on July 31, 1990. See Hutchison and Harper, No. 03C01-9606-CR-00232, slip op. at 8, 11. In Burford v. State, 845 S.W.2d 204 (Tenn. 1992), however, our supreme court held that in certain situations, application of the statute of limitations in a post-conviction proceeding might violate constitutional due process. In determining whether there has been such a violation, the essential question is whether the time period allowed by law provides the petitioner a fair and reasonable opportunity to file suit. Id. at 208. In Burford, the petitioner could not have filed within the three-year limitation absent a

determination on a prior post-conviction petition challenging certain previous convictions. Our supreme court ruled that under those circumstances, the petitioner was "caught in a procedural trap and unable to initiate litigation . . . despite the approach of the three-year limitation." Id.

In Sands v. State, 903 S.W.2d 297 (Tenn. 1995), our supreme court further defined how to apply the Burford test. Courts are required to

(1) determine when the limitations period would normally have begun to run;
(2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
(3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim. In making this final determination, courts should carefully weigh the petitioner's liberty interest in "collaterally attacking constitutional violations occurring during the conviction process," against the State's interest in preventing the litigation of "stale and fraudulent claims."

Id. at 301 (quoting Burford, 845 S.W.2d at 207, 208).

In the first appeal, this court was unable to determine whether Harper's FBI laboratory report claim was later arising within the meaning of Burford and Sands and, therefore, remanded the case to the trial court for further factual findings. Upon remand, the trial court determined that the claim was still viable:

Prosecution and defense counsel stipulated at the second jury trial in 1985 that FBI lab reports were inconclusive in establishing or eliminating defendant Hutchison's tools as those used to burglarize Jane Marie Wells vehicle. During the course of that jury trial, the prosecution strongly implied that defendant Hutchison's tools were used to accomplish the burglary of the Wells' vehicle. That the FBI lab reports in fact, everyone now agrees, conclusively eliminate defendant Hutchison's tools as those used to accomplish the burglary. That petitioner Hutchison learned that the lab reports excluded his tools after he obtained copies of those reports in late 1991 as the result of a freedom of information request.

Petitioner Harper first learned of the contents of the FBI lab reports when he visited Petitioner Hutchison in 1992 while Petitioner Hutchison was still incarcerated in the Tennessee Department of Corrections. Petitioner Harper filed his petition for post-conviction relief on January 21, 1993 within one year of learning the contents of those reports.

\* \* \*

Petitioner Harper's post-conviction statute of limitations ran on July 31, 1990. This court finds, however, that Petitioner Harper did not learn of the existence of the exculpatory lab test until visiting Petitioner Hutchison in the penitentiary in 1992,

-9-

and that he filed his post-conviction petition within one year following discovery of this information. Further, applying the strict limitation period would deny Petitioner Harper an opportunity to present this meritorious claim.

(Emphasis added.)

Initially, the FBI laboratory reports at issue are not contained in the record on appeal. It is the duty of the appellant to prepare a complete and accurate record on appeal. Tenn. R. App. P. 24(b). Thus, the failure to include the reports could result in a waiver of the issue. See Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). Nevertheless, this court "may take judicial notice of facts in an earlier proceeding of the same case," State ex rel. Wilkerson v. Bomar, 213 Tenn. 499, 376 S.W.2d 451, 453 (1964), and the reports are included in the record of the first appeal.

Although the state appears to concede that the FBI burglary tool lab report is exculpatory, the record demonstrates that there are actually two separate reports, one of which is partially exculpatory and one of which is inconclusive. The first report, dated December 22, 1982, contains the following passage relevant to Hutchison's burglary tools:

> The Q7 through Q11 locks [four ignition locks recovered from Hutchison's residence and the ignition lock of the victim's automobile] bear toolmarks produced by a screw(s) of approximately the same diameter as specimens K6 [screw recovered from Hutchison's residence], K7 [broken screw recovered from front seat of victim's automobile] and the screw in the K4 dent puller [recovered from Hutchison's residence]. Although the toolmarks in specimens Q7 through Q11 bear limited microscopic characteristics of value for comparison purposes, these marks could not be reproduced in the FBI laboratory using the above-mentioned screws. Based on differences in diameter, the toolmarks in Q7 through Q11 could not have been produced by the screw in the K5 dent puller [recovered from Hutchison's residence]. Further, no toolmarks were found in specimens Q7 through Q11 which could have been produced by the K2 or K3 pliers [recovered from Hutchison's residence].

The first portion of this report is inconclusive. Although the five ignition locks bear marks that could have been made by screws such as the one recovered from Hutchison's residence, the broken one recovered from the victim's vehicle, or the one in the small dent puller, the FBI was unable to reproduce those marks in the lab using those screws. The second part of the report, however, qualifies as exculpatory. Laboratory testing established that the marks on the locks could not have been made by either the large dent puller or the two pairs of pliers recovered from Hutchison's residence.

The second report, dated approximately one month later, January 20, 1983, contains the results of microscopic examinations of the burglary tools:

The screw from the K4 dent puller, specimens K6 and K7, specimen Q8 as a representative sample of specimens Q7 through Q10, specimen Q11, and debris from specimens K2 and K3 were examined by instrumental means. Foreign materials were found on specimen K7 which are consistent with having originated from specimen Q8 or specimen Q11. No foreign materials of value for association purposes were found on specimen K2, specimen K3, the screw from the K4 dent puller or specimen K6.

This report was mildly inculpatory. The screw recovered from the victim's vehicle contained foreign materials which could have been transferred from the ignition lock of the victim's vehicle or one of the ignition locks recovered from Hutchison's residence. The remainder of the report was completely inconclusive.

The record does not contradict the trial court's finding that Harper's discovery of the "exculpatory lab test" was later arising within the meaning of Burford. At the petitioners' first trial, Ernest Roger Peel, a special agent with the Federal Bureau of Investigation, testified regarding his examination of Hutchison's tools and the ignition lock of the burglary victim's vehicle. Neither report was made an exhibit in the trial. After the proof was closed, Harper's counsel asked for a mistrial on the grounds that the state had failed to provide the defense with necessary discovery:

[COUNSEL FOR HARPER]: Your Honor, . . . we had filed a [m]otion for [d]iscovery . . . months and months before this matter was originally set for trial. And the only response to that [m]otion . . . was – we were told verbally that there would be an expert F.B.I. witness from Washington, D.C. to come in and testify. We were not provided the results of any tests or analysis that he had done. . . .

Attorney Shirley, Harper's counsel at the second trial, testified at the first post-conviction hearing that he had read the transcript of the first trial and, by the time of the second trial, was fully aware of the motion for mistrial in the 1984 proceeding. He acknowledged that he did not pursue copies of the report because he "was under a very tight time frame," explaining that he primarily relied upon the preparation by Hutchison's attorney: "[M]y actual participation in the trial was very limited. I think I did a cross-examination of [the victim] . . . . But as far as . . . the other stuff, you know, [counsel for Hutchison] was handling that part of the trial. . . ."

As indicated, at the second trial, the parties stipulated that laboratory testing was inconclusive. Neither of the two reports, however, was made an exhibit at the trial. During a bench conference held outside the hearing of the jury, the following exchange took place:

[PROSECUTOR]: Your Honor, at this time the State would offer every exhibit that is currently in for identification as its numbered exhibit.
THE COURT: All right.
[COUNSEL FOR HUTCHISON]: And we have no objection as long as –

> [PROSECUTOR]: As long as we agree to stipulate the following. Specialist Bohanon and Specialist Huffaker are Criminalistics officers with the Knoxville Police Department, and pursuant to Detective Morris and Detective Wade, most, if not all, of the tools, the screw, and this type of evidence that we have offered was forwarded to the FBI lab in Washington, D.C. and returned in the regular course of business from the FBI to the custody of the Knoxville Police Department where it has remained until these proceedings began. And any tests conducted on any of those tools or that evidence resulted in inconclusive – well, inconclusive results.
>
> THE COURT: All right.
>
> [COUNSEL FOR HUTCHISON]: That is the stipulation, your Honor.
>
> THE COURT: That is the stipulation. All right.

Attorney Shirley, testified that he failed to review either of the reports because he did not have them and did not "have time to get them," choosing instead to enter into a blind stipulation as to their contents.

While this court cannot point to any intentional omission on the part of the state, the trial court specifically found that the petition for relief was filed by Harper within one year of his discovery of the "exculpatory report." That the parties now agree that the testing established that the tools found in Hutchison's residence were not used during the offenses and that one laboratory report qualifies as exculpatory is of significance. In the first trial, Agent Peel testified only as to his findings on the materials transfer test, which were inconclusive. As indicated, neither of the lab reports was offered as an exhibit. Attorney Dixon explained that he did not call Peel to testify at the second trial because his testimony at the first trial had gone so poorly. Had the exculpatory report been produced, Peel's testimony would have likely been helpful for the defense.

In summary, the statute of limitations began to run on Harper's post-conviction claims on July 31, 1987. See Hutchison and Harper, No. 03C01-9606-CR-00232, slip op. at 9. The trial court found that the "exculpatory report," when there were two reports, one of which was inconclusive, was not discovered by Harper or his counsel until 1992. A strict application of the limitations period would ordinarily prohibit a Brady claim under the Burford rule. Because the state makes no claim that the litigation of a "stale" issue would outweigh Harper's constitutional entitlement to the due process of law and because the record establishes a greater interest in the preservation of a constitutional entitlement, it is our view that the trial court did not err by considering the merits of Harper's claims.

II

Next, the state asserts that the trial court erred by allowing the petitioners to amend their petitions after remand to include allegations that the state improperly withheld evidence of ballistics testing on the weapon seized from Billy Hall and the written statement of Gail Comer Pierce. Although no relief was granted on the amendment relative to the ballistics testing, the withholding of Pierce's statement, set out as follows, was a partial basis for relief:

-12-

At approximately 2:50 AM I was in my bedroom with the window open when I heard someone walking outside my bedroom in the grass + then say in a very angry loud voice "You Mother F\*\*ker, I'm going to shoot you" or something very similar. I then heard what sounded like [the victim] getting up because I heard footsteps in room directly above mine, then I thought I heard him opening or closing glass sliding doors leading to patio. I heard him walking around for a minute or two more then I heard what sounded like his front door closing. After 2-5 minutes I thought what I heard were firecrackers, 2 sets, and looked out of my living room window/door to see if anyone was moving around but did not see any movement. I then tried to call [the victim] several times, but there was no answer.

The state argues that the amendments exceeded the scope of this court's order on remand and were not justified under either Burford or Sands. The petitioners contend that the new allegations merely expanded on claims that had already been asserted and that, given the civil nature of post-conviction proceedings, such amendments should be liberally permitted. See Tenn. R. Civ. P. 15.01 (governing amendment of civil pleadings). They also assert that the amendments were required by constitutional due process.

In remanding this case after the first post-conviction appeal, this court provided the following instructions:

> The alleged exculpatory information on [Harper's] second Brady issue, the information found in the reports prepared by the F.B.I. laboratory, presents a different problem. The evidence in the record is contradictory and inconclusive, and the post-conviction court made no findings of fact from which we can determine when these grounds arose. Factual issues raised by the evidence must be resolved by the trial court. Therefore, upon remand, the post-conviction court must determine whether these grounds are truly later arising and whether a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present his claim about the F.B.I. lab report.
>
> * * *
>
> The petitioners claim that the prosecution did not provide the F.B.I. reports despite their motions for discovery. The state contends that the petitioners had these reports prior to the first trial. The trial court and not this court must resolve the conflicting evidence, determine whether the state withheld the reports, and when the defense actually received copies of them. At that point, the trial court will be able to determine whether Harper's post-conviction petition meets the criteria set forth in Sands. With respect to Hutchison's petitions, the trial court should also make findings resolving Hutchison's claim of ineffective assistance of counsel. Based on these findings, the post-conviction court may then determine whether to grant or deny the petitions for relief.

Hutchison and Harper, No. 03C01-9606-CR-00232, slip op. at 18 (citations omitted). After the remand, the post-conviction court allowed the petitioners to amend their petitions to include Brady claims, set forth above in their entirety, regarding the statement of Gail Comer Pierce and the additional ballistics testing performed by the state. In doing so, it determined that the amendments were justified as later arising claims:

> While the state objects to allowing these amendments, the court believes [they] should be allowed. If viewed under a Sands analysis, while these grounds clearly are raised well after the appropriate statute of limitations, they were not discovered by the petitioners until preparing for the second post-conviction trial. Further, the court believes one of the two issues to be meritorious and denying the petitioners an opportunity to raise it is not, in the opinion of this court, appropriate under the circumstances.

At the conclusion of the evidentiary hearing, the trial court denied the petitioners' claims on the ballistics testing issue but determined that the failure to provide the Pierce statement was, in connection with the exculpatory report on Hutchison's burglary tools, a basis for relief.

Our supreme court first recognized the power of a reviewing court to limit orders of remand in Perkins v. Brown, 132 Tenn. 294, 177 S.W. 1158 (1915). In that case, our high court affirmed the judgment in favor of the plaintiff, but remanded the matter to the trial court for a re-determination of damages. In doing so, it determined that judicial economy strongly supported adoption of a rule allowing reviewing courts to issue limited remand orders:

> A statement of the rule in succinct terms is to be found in 2 R. C. L. 287, § 241:
>
> > "Probably from a desire to eliminate unnecessary litigation, and in the exercise of the discretion with which the appellate court is invested with respect to the granting of new trials, it is undoubtedly the present general rule, in remanding a cause for a new trial, either by a court or a jury, when error exists as to only one or more issues, and the judgment in other respects is free from error, to limit the new trial to the issues affected by the error. This rule permitting the appellate court to limit the issues has been held applicable in actions sounding in damages when the error affects only the assessment of damages, and the new trial has been limited to that question alone."
>
> *    *    *
>
> If it is to the interest of the state that there be an end to litigation, the courts should not be slow to adopt this rule that looks to the preventing of further contest on phases of litigation or issues already well settled, the saving to litigants the costs incident to the relitigation of such matters, and to the courts the time unnecessarily consumed therein.

As has been noted above, the power is one to be exercised by the court of review in its sound discretion.

177 S.W. at 1160.

Much later, in Cook v. McCullough, 735 S.W.2d 464 (Tenn. Ct. App. 1987), our court of appeals recognized the power of the appellate courts to limit the scope of a remand. Similarly, in State v. Irick, 906 S.W.2d 440, 443 (Tenn. 1995), our supreme court, noting that the trial court properly refused to exceed the scope of the high court's remand, ruled that "'inferior courts must abide the orders, decrees and precedents of higher courts. . . . [Otherwise] [t]here would be no finality or stability in the law and the court system would be chaotic in its operation and unstable and inconsistent in its decisions'" (quoting Barger v. Brock, 535 S.W.2d 337, 341 (Tenn.1976)). Most recently, in Weston v. State, 60 S.W.3d 57 (Tenn. 2001), our high court ruled that the post-conviction court had exceeded its remand authority by permitting the petitioner to amend his petition to assert two additional claims of ineffective assistance of counsel:

> Neither a trial court nor an intermediate court has the authority to expand the directive or purpose of this . . . remand [which] . . . clearly limited the issue . . . to "whether the petitioner was denied a first-tier appeal of his original post-conviction petition as a result of inaction on the part of appointed counsel."

Id. at 59.

This case is different. In the cited cases, the amending party could have asserted its claims at the initiation of the litigation. See Weston, 60 S.W.3d at 58 (additional claims relating to counsel's trial performance); Cook, 735 S.W.2d at 467-68 (additional claims relating to constitutionality of statutes governing delinquent taxpayer actions). In contrast, the claims contained in the amendments in this case were later arising. See Chaille v. Warren, 689 S.W.2d 173, 179 (Tenn. Ct. App. 1985) (holding that issue of additional appellate attorney's fees was properly addressed after limited remand "because it was not an issue, and, therefore, was not part of the first appeal in this case"); Charles Kenneth Branch v. Virginia Louise Thompson, No. M2001-012310COA-R3-CV (Tenn. Ct. App., at Nashville, Feb. 22, 2002) (stating that the law of the case doctrine applies only to issues that were actually before the court or were necessarily decided by implication). This court remanded for further proceedings on December 23, 1997. The petitioners did not learn of the statement of Gail Comer Pierce or the TBI ballistics testing until April 15, 1999. Utilizing the Burford rationale, the petitioners would have been entitled to file motions to re-open their petitions to assert these claims. See Tenn. Code Ann. § 40-30-217. Concepts of judicial economy and preservation of the law of the case would ordinarily preclude the expansion of a limited remand. This is not an ordinary situation. The amendments were proper and, while the ballistics testing is not an issue in this appeal, the ruling that the Pierce statement served as a partial basis for relief is properly before this court.

III

Next, the state contends that the trial court erred by determining that the state withheld the FBI laboratory reports on Hutchison's burglary tools and the statement of Gail Comer Pierce in violation of the ruling in Brady. It argues that the prosecution did not suppress the reports, the existence of which was known to all parties, and that they were available for review by the petitioners' counsel prior to trial.

In the landmark case of Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court ruled that a prosecutor has a duty to furnish exculpatory evidence to the defendant upon request. Exculpatory evidence may pertain to the guilt or innocence of the accused and/or the punishment which may be imposed if the accused is convicted of the crime. State v. Marshall, 845 S.W.2d 228, 232 (Tenn. Crim. App. 1992). Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Thus, the duty to disclose arises when the evidence is material, the evidence is favorable for the defense, and a proper request for production is made by the defendant. See United States v. Bagley, 473 U.S. 667 (1985); Strouth v. State, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986). Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. United States v. Agurs, 427 U.S. 97, 110 (1976).

Before this court may find a due process violation under Brady, the following elements must be established:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> 2. the State must have suppressed the information;
> 3. the information must have been favorable to the accused; and
> 4. the information must have been material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995) (as amended on rehearing).

With regard to the FBI burglary tool laboratory reports, the trial court specifically found three of the four elements establishing a Brady violation, but made no determination as to whether the state had suppressed the evidence. Only because relief was granted on this ground, however, is there any indication that the state (intentionally or unintentionally) withheld the information. The trial court found as follows:

> This court concludes that the FBI lab reports which excluded Leonard Hutchison's tools as those used to attempt the burglary of Ms. Wells' vehicle in 1982 are material and important evidence which, had it been presented to the jury, may

-16-

very well have affected the verdict. The more difficult issue lies in assigning blame for the stipulation presented to the jury that labeled the test results as inconclusive.

One can argue that the District Attorney should have known that the reports excluded the tools as those used in the burglary and had a Brady obligation to disclose this information to defense counsel, and that a defense lawyer should be able to rely on the representation made by the District Attorney that the tests were inconclusive, thereby placing all blame o[n] the District Attorney. Or, you can take the position that a defense lawyer should never rely on the representation of the District Attorney and always check any information personally, particularly the results of scientific tests. This court subscribes to neither view in this particular case. Rather, it appears that it is a combination of oversights by two excellent lawyers who were acting in good faith, albeit erroneously. The District Attorney should have known that the test results excluded the tools and disclosed that fact. Defense counsel should have reviewed the reports and discovered their true content. Which ever way one chooses to view it, it is clear that Petitioners were denied an opportunity to have this important information put before the trier of fact, which, in this court's view, undermines the reliability of the jury's verdict and justifies granting the relief sought by the petitioners.

As to the statement of Gail Comer Pierce, the trial court made the following findings:

One of the long standing defense theories in this case is that [the victim's] cousin, who had had a disagreement with and had threatened [the victim] shortly before this incident, was the actual shooter. The statement of Ms. Pierce clearly lends credence to the fact that another individual, who was shouting obscenities, was at the apartment complex shortly before [the victim] was shot. While this evidence does not clearly establish another person as the shooter, it certainly lends support to that theory and should have been disclosed to petitioners and their counsel. Further, this information was clearly developed by the Knoxville Police Department which was the agency principally responsible for the investigation and intimately involved in the prosecution of petitioners. While the court does not believe that the District Attorney's office was personally aware of this statement, it was clearly evidence developed by the state which should have been disclosed to defense counsel.

While this single omission may not, in and of itself, justify the granting of a new trial for petitioners, the court believes when taken in conjunction with the information now known about the FBI lab results, that this additional information further erodes the reliability of the verdict at the second trial of this cause.

The statement of Ms. Pierce qualifies as exculpatory because it tends to support the defense theory that the victim had been shot as the result of a dispute unrelated to the car burglary. She was awakened by someone making threats outside her window. She then heard the victim, who was

apparently sleeping in the room above hers, get up and leave the residence just minutes before the gunshots. Her version of the events is in conflict with the account of the victim, who contended that he had been awakened by tapping. In our view, the trial court implicitly ruled that the petitioners were entitled to relief based upon the state's failure to disclose the exculpatory material. That the prosecutor acted in good faith, as was confirmed by the trial court, and had overlooked either the lab report or the Pierce statement or their relative significance does not excuse the responsibility to disclose under the ruling in Brady. See Kyles v. Whitley, 514 U.S. 419 (1995).

In summary, implied in the ruling of the trial court is that the state, acting in good faith, unintentionally failed to disclose exculpatory material. The lab report which concluded that certain of Hutchison's tools were not used in the burglary would have been helpful to the defense. The Pierce statement would have also supported the theory of defense. The evidence, in our view, does not preponderate against the finding of the trial court.

IV

Although Harper argues that he is entitled to relief on grounds of ineffective assistance of counsel, he has no such claim pending. Hutchison does. Harper's motion to amend to assert the ineffective assistance of trial counsel, filed after the remand, was never addressed by the trial court and he does not argue in this appeal that the trial court erroneously failed to grant the proposed amendment. The state contends that Hutchison failed to establish that he received the ineffective assistance of counsel at trial. The trial court did not specifically address the issue, merely observing that "defense counsel should have reviewed the reports and discovered their contents" and that "the lawyers acted in good faith, albeit erroneously."

In a post-conviction proceeding, the petitioner bears the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). On appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Bates v. State, 973 S.W.2d 615 (Tenn. Crim. App. 1997). When reviewing the application of law to those factual findings, however, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001); see also State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the petitioner fail to

establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

With regard to the FBI laboratory reports on Hutchison's burglary tools, Attorney Trant testified as follows:

> A    Let me say this. I know that at one point during the trial I stipulated with [the assistant district attorney] that the results of the report would be inconclusive. I don't have an independent recollection now of how I came to that stipulation, but it would of had to have been one of two things or a combination of both. It would of had to have been either reliance on what happened at the first trial and/or representations made to me by either Mr. Jennings and/or Mr. Dixon.
>
> \*        \*        \*
>
> Q    With regard to the F.B.I. laboratory report, do you recall ever being told any specific information by the prosecutors or the police officers who were actively involved in the investigation of Mr. Hutchison's case anything specific with respect to scientific findings on analysis of screws and screw markings?
>
> A    No, sir, I have not. I have subsequently seen the report. I never saw the report until well after . . . the second trial, the case that I tried. And had I seen that analysis which I believe clearly to be exculpatory, I would have used it at trial. I would have used it to impeach and/or call the F.B.I. and to enlist myself to testify about what is obviously exculpatory information.
>
> \*        \*        \*
>
> THE COURT  Now, are you saying, Mr. Trant, that you were unaware of the fact that those reports existed, notwithstanding the fact that they were used and testified from at the first trial?
>
> A    No, sir, I'm not unaware that the reports existed. In fact, I'm sure I relied on that. What I was unaware of was the exculpatory portions of the F.B.I. report, the

-19-

part dealing with the fact that the tools that were found in Mr. Hutchison's trailer were excluded as being used in the Wells' car. I'm not – that did not come out in the first trial. I was never told that before the second trial, and I was never given a report indicating that before the second trial.

*      *      *

Q      If you did not request a copy of the report in a specific fashion or force that issue as the record bears out, what explanation do you have to yourself as to why you would not have done that?

A      The only explanation I have . . . is that I would have relied on what Mr. Jennings and/or Mr. Dixon told me. I had no reason to disbelieve either one of them at that point. That may have been a mistake on my part, not – I mean to rely on what they told me and not to insist on seeing the report. If I were doing it today, I guess I'd insist on seeing the report, having seen what happened.

The better course would have been for Attorney Trant, if aware of their existence, to have asked to see the reports. Time has eroded the memories of the attorneys on each side. There were two reports, as it turned out, only one of which was exculpatory. Attorney Trant's testimony makes it apparent that he was aware of the existence of the testing and yet opted not to review the reports, satisfied that the state had accurately stipulated the inconclusiveness of the results, never anticipating that the contents might have been at least partially favorable. He cannot cite any specific misinformation provided to him by the prosecution or identify its source. Of course, a failure to review laboratory reports before stipulating to their contents is an act involving some risk. Although not wholly exculpatory, the results were not incriminating. Because Hutchison's burglary tools were introduced at the second trial, implying that they were used during the crime, the FBI lab reports would have been helpful in the defense of the petitioners. That the trial court made no findings on the issue, especially after our remand, but nevertheless granted relief may have qualified as an act of diplomacy, designed to avoid taint to the experienced and capable defense lawyers rather than to address the merits of Hutchison's claim, or even the belated claim of Harper, of deficient performance. If it were essential to the grant of relief, this court would be inclined to remand the issue once again for specific findings of fact and conclusions of law. Because relief can be granted on the Brady issue, however, this court will not address the state appeal on this issue.

V

Finally, in a counter appeal, the petitioners contend that the post-conviction court erred by excluding the affidavit of a juror who claimed that he would have voted against conviction had he heard evidence of the FBI laboratory reports on Hutchison's burglary tools.

The affidavit provided as follows:

I was a juror in the trial of Leonard Hutchison and James Harper in which they were convicted of the shooting of David Comer and auto burglary. It has come to my attention from an article in The Knoxville News-Sentinel on January 5, 1998 that evidence that the burglary tools found at Leonard Hutchison's residence were

-20-

inconsistent with those used in the auto burglary was not provided to the jury in this case. The evidence at trial that the tools were found at Mr. Hutchison's residence was extremely important to [] the jury's decision to convict Mr. Hutchison and Mr. Harper. Had we had this evidence that the tools were inconsistent to the tools found at Mr. Hutchison's residence, such evidence would have created a reasonable doubt in my mind and would have had a strong impact on the jury and may well have changed the jury's decision.

The juror allegedly initiated contact with Attorney Trant after having read the referenced newspaper article.

In our view, this evidence was prohibited by Tennessee Rule of Evidence 606:

Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b). In State v. Blackwell, 664 S.W.2d 686 (Tenn. 1984), our supreme court adopted Federal Rule of Evidence 606(b), which it described as a codification of Tennessee law, as to the admissibility of juror testimony when the verdict's validity is under challenge. The Tennessee rule of evidence, which came into effect in 1989, is identical to the federal rule. None of the exceptions to the rule apply here. In our view, the trial court properly excluded the affidavit.

The judgment granting post-conviction relief is affirmed. Each petitioner is granted a new trial.

_____
GARY R. WADE, PRESIDING JUDGE