# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
November 18, 2003 Session

## STATE OF TENNESSEE v. CARTER MASTERS

**Appeal from the Criminal Court for Overton County**
**No. 5,000     Leon Burns, Jr., Judge**

---

**No. M2003-00305-CCA-R3-CD - Filed June 2, 2004**

---

The defendant, Carter Masters, was convicted by a jury of two counts of especially aggravated kidnapping, aggravated burglary, and aggravated assault. The trial court imposed concurrent sentences of twenty years for each kidnapping, four years for the burglary, and three years for the aggravated assault. In this appeal of right, the defendant asserts that he was denied due process because the mental health expert retained by trial counsel was incompetent. In the alternative, he argues that trial counsel was ineffective for failing to select a competent psychologist. The defendant also asserts that his due process rights were offended by the state's cross-examination of the defense psychologist. The judgments of the trial court are affirmed.

### Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Douglas A. Trant, Knoxville, Tennessee (on appeal), and James D. White, Jr., Celina, Tennessee (at trial), for the appellant, Carter Masters.

Paul G. Summers, Attorney General & Reporter; Kim R. Helper, Assistant Attorney General; and Owen G. Burnett, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant was initially charged with two counts of especially aggravated kidnapping, one count of aggravated burglary, and two counts of aggravated assault. Ruth Thrasher, the defendant's estranged wife, was the named victim of one of the kidnappings and one of the assaults. Ms. Thrasher's granddaughter, Jennifer Fletcher, was the victim of the remaining charges. A subsequent indictment charged especially aggravated kidnapping for each victim and an additional aggravated burglary count. The jury found the defendant guilty of one count of especially aggravated kidnapping for each victim, one count of aggravated burglary, one count of the lesser included offense of aggravated criminal trespass, one count of aggravated assault as to Ms. Thrasher, and one

count of the lesser included offense of assault as to Ms. Fletcher. The trial court dismissed the aggravated criminal trespass charge. The effective sentence was twenty years.

At trial, Ms. Thrasher testified that she had known the defendant for twenty-three years and that they married in 1993. After a political argument with the defendant in November of 2000, she moved out of their residence and filed for divorce. A marital dissolution agreement was filed in March of 2001. Three days later, the victim returned to a residence she shared with her granddaughter and two great-grandchildren, ages two and four, and found the defendant hiding in her bedroom closet. As she opened the second of her closet's two bi-fold doors, the defendant, "nervous and shaky," pointed a pistol at her and said, "[T]his is the only way I can think to do it." When Ms. Fletcher and the victim's great-granddaughter entered the bedroom, the defendant directed all of them into the living room "to talk." According to Ms. Fletcher, the defendant told her there would be no trouble if Ms. Thrasher left with him, and warned that he had $10,000 to pay for a contract killing if Ms. Fletcher informed the authorities of the abduction. Ms. Thrasher agreed to accompany the defendant but before they left, Ms. Fletcher unsuccessfully tried to take the gun from the defendant who threatened to kill her. At the defendant's insistence, Ms. Thrasher packed a small overnight bag, carrying some clothes over her arm. The defendant instructed her to drive to his residence in her car. Although Ms. Thrasher "never saw the gun any more," the defendant ordered her to park her car behind his storage building and directed her to his van. The defendant stopped at a Wal-Mart in Sparta, where they purchased a new battery for the van and a pair of shoes for Ms. Thrasher. As he drove, the defendant held her hand and told her that he "was going to prove how much he cared." Over the next two days, the defendant drove toward the Florida Keys, stopping at the space center and a fruit stand along the way. When they reached Daytona, they checked into a motel and went for a drive before the defendant was arrested by authorities. The defendant apologized to Ms. Thrasher for "the way he treated [her] and [her] family."

David Fletcher, who is married to Ms. Thrasher's granddaughter, recalled that Ms. Fletcher was afraid to call the police because the defendant had threatened her with death. He determined that the defendant likely entered the residence through a back bedroom window which was partially open. Fletcher related that he and James Norrod drove to Daytona for the victim after she had been found by authorities.

Jennifer Fletcher, who described the defendant as intelligent and detail-oriented, testified that she had warned the defendant that Ms. Thrasher wanted no contact with him. She otherwise corroborated Ms. Thrasher's version of the confrontation and abduction. She specifically confirmed that the defendant was armed and accused her of being responsible for his problems with Ms. Thrasher. When Ms. Fletcher informed the defendant that her boyfriend would arrive shortly after noon to pick up the children, he replied, "If [he] gets here at 12:30, he'll find three dead bodies if we don't get this straightened out." Ms. Fletcher also acknowledged that she attempted to take the gun from the defendant but was unsuccessful. When she attempted to remove her daughter from the room, the defendant pointed the cocked gun at her and warned her, "If you go through those doors, you'll go through a dead woman." When the victim ultimately agreed to leave with the defendant

if he would not hurt anyone, he informed Ms. Fletcher that he had hired someone to kill her if she called the police.

Betty McCormick, an employee of American Savings Bank, testified that less than a month before the abduction, the defendant withdrew a $10,000 certificate of deposit. A cashier's check was issued in the amount of $4,197.42 and the remainder was in cash.

Allen Masters, the defendant's only child, testified on behalf of the defense. He stated that prior to his separation from Ms. Thrasher, the defendant had a good memory for details, particularly with regard to geography, and that afterward, the defendant was "unfocused" and obsessed with a reconciliation. Masters observed that the defendant ate less, slept erratically, could not concentrate, and talked and mumbled to himself. A month or so before the crimes, Masters noticed an improvement in the defendant's behavior.

Janice Majewski, the defendant's niece, testified that on one occasion, when she called the defendant's residence, Ms. Thrasher informed her that she and the defendant were reconciling. According to Ms. Majewski, Ms. Thrasher stated that she intended to move back into the defendant's residence.

The defendant's brother, Robert Masters, testified that although he lived in Arizona, he and the defendant visited each other several times a year and spoke frequently by telephone. He recalled that a month before the abduction, the defendant "couldn't sit still over about five (5) minutes" and began to lose his way in familiar places. He testified that he had asked the defendant to bring him the cash from a $10,000 certificate of deposit that had matured in February of 2001.

Eric Engum, a clinical psychologist with specialties in clinical neuropsychology and forensic psychology, first met with the defendant in June of 2001, three months after the crimes. After approximately nine hours of consultation with the defendant, Dr. Engum administered a battery of tests, including eight standardized tests relating to extended mental status, five tests which assessed neuro-psychological function, and one personality inventory examination. After reviewing documents, Dr. Engum later administered the Wexler Memory Scale test, the verbal and visual components of which provide results as to the functioning of each hemisphere of the brain. Dr. Engum described the defendant, who had an I.Q. of 104, as "somebody who had periods where he became mildly agitated, somewhat irritable, angered at very minor kinds of things," indicating a lack of self control. It was his opinion that the defendant, who was competent at the time of the offenses and competent to stand trial, suffered from Alzheimer's dementia. Dr. Engum related that his testing suggested that the right hemisphere of the defendant's brain, which controls "what we call social intelligence," had a greater loss of cognitive function than the left. He added that the defendant would also have been suffering stress as a result of having had prostate cancer.

It was his opinion that the defendant was "obsessed" with reconciling with the victim and had realized that the argument underlying their separation was "irrational." As to the defendant's state of mind at the time of the offenses, Dr. Engum testified as follows:

-3-

Q Now, do you have an opinion as to whether . . . [the defendant] was able to know that he was violating the law?

A For kidnapping her, I don't believe that he did. I believe that in his mind, and from everything he said and from what all the test results say, he was absolutely obsesse[d] with the concept of if I can just talk to her, and I can factor out the granddaughter so that she is not convincing my wife to stay away from me; If I can get her off to the side and not have to deal with her, then I can convince [the victim] to return to me and we can go on the way we were before. I think that was the sole focus and that is where his mind was.

* * *

Q You mentioned a moment ago, and let me back up just a moment, as to the kidnapping, and the aggravated burglary that he is charged with, and the aggravated assault. Do you have an opinion as to the mental element of those whether . . . he was substantially impaired, his capacity was, that he wasn't capable of knowing that he was violating the law?

A For the kidnapping, clearly. Clearly the kidnapping. You know, again, did he know that he was breaking into that trailer? Yeah, he did that. It was for a different purpose. He wasn't breaking in to steal anything. He was breaking in to sit in that closet. Remember, he broke in Sunday morning. He had two meat pies and I think a jug of water, and something to urinate in. He was planning on staying in that closet hidden from Sunday morning until sometime the following Monday morning, when the granddaughter would leave and he would have the chance to come out and in some way convince [the victim] to come home with him. So, did he know he was breaking in to do that? Yes, he did. All right. Did he know that he was waving the gun to . . . keep the granddaughter out of the interaction between h[im] and his wife? Yes, he did. For the kidnapping, I think . . . the information I have[,] tells me that all he was interested in was reclaiming . . . and reconciling with his wife, and that the idea of violating the law never crossed his mind.

In rebuttal, the state called Dr. William R. Sewell, a licensed clinical psychologist with the Western Mental Health Institute in Bolivar. He testified that he interviewed the defendant, whom he described as responding "appropriately and directly," in May of 2001, two months after the crimes. It was Dr. Sewell's opinion that at the time of the offenses, the defendant "was conscious of his actions. His thought processes were rational. He had made plans and was acting on those plans. He engaged in certain activity indicating that he could appreciate the wrongfulness of his actions." Dr. Sewell recalled that the defendant reported that he had entered the victim's residence with a key after consuming a twelve-pack of beer. He indicated that although the defendant seemed anxious at the beginning of the interview, he relaxed as it progressed, indicating that he did not have a mood disorder. Dr. Sewell testified that in his assessment, the defendant's cognitive functioning was typical of his age and there were no deficiencies that would indicate dementia. He stated that at the time of the offenses, the defendant "was rational . . . and was knowledgeable of the wrongfulness." During cross-examination, Dr. Sewell acknowledged that "the defendant[] . . .

believed the offenses to have occurred on the same day as the election argument. He estimated that he met with the defendant for a total of approximately ninety minutes.

During rebuttal, Ms. Thrasher denied that she had told Ms. Majewski that she and the defendant were reconciling. She also testified that the defendant had no trouble navigating the route on their trip to Florida.

After the verdict, a motion for new trial was filed. Later, the defendant discharged his trial counsel and hired another attorney for the appeal. Through his new counsel, the defendant filed an amended motion for new trial alleging, among other things, that Dr. Engum had provided incompetent assistance, that his due process rights had been violated thereby, and that trial counsel had been ineffective in retaining Dr. Engum.

At the hearing on the motion for new trial, Jerry Reeder and Jeffrey Smith, jurors at the defendant's trial, testified that the expert psychological proof put on by the defendant and the state resulted in a "draw" on the subject. It was their opinion that the expert testimony did not affect the verdict. Dr. Pamela Auble, a clinical neuropsychologist who examined and tested the defendant after the trial, testified that the defendant's functioning was impaired due to "difficulty in judgment in his ability to come to good conclusions to form reasonable plans of action." While describing the defendant as not particularly anxious or depressed at the time of the interviews, Dr. Auble believed that he was at the time of the offenses and agreed with Dr. Engum that the defendant did not intend to violate the law. She also testified, however, that Engum's testimony that the defendant could have had the requisite intent for only some of the offenses did not "make any sense."

The defendant's trial counsel testified that due to the nature of the state's proof, it was his opinion that the best defense would be to challenge the presence of mental elements required of the charged offenses. He stated that he relied on Dr. Engum's report, which indicated that the defendant "was functioning with a diminished capacity to reason such that he did not fully appreciate or even consider that his actions were potentially harmful to others or in violation." Trial counsel contended that the written report did not make distinctions among the various charges. He explained that he "never gathered" from the report that Dr. Engum might testify that the defendant had the requisite mental state for some of the charges and not others. Trial counsel stated that Dr. Engum's testimony that the defendant might have had the requisite mental intent as to the charges relating to Ms. Fletcher was a "complete surprise." He acknowledged that he had questioned potential jurors about mental capacity during voir dire and that he addressed the petit jury on the subject of diminished capacity during his opening statement.

I

Citing Ake v. Oklahoma, 470 U.S. 68 (1985), the defendant first claims that he was denied due process because his mental health expert, Dr. Eric Engum, was incompetent to testify at trial. In the alternative, he claims that trial counsel was ineffective for failing to select and retain a competent psychologist. The state asserts that Ake does not recognize the right to the effective

assistance of a psychiatrist or psychologist and that trial counsel was not ineffective for retaining Dr. Engum.

In Ake v. Oklahoma, the Supreme Court held that an indigent defendant's right to due process had been violated by a denial of funds to employ a psychiatrist. In Ake, a capital case, although the defense was insanity, neither the state nor the defense offered any expert testimony on the defendant's sanity at the time of the offense. Id. at 72. The Supreme Court ruled that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." Id. at 75. The Court reasoned that fundamental fairness would not be met if "as a result of his poverty, a defendant is denied the opportunity to participate meaningfully" in his trial. Id. at 76. The state is required to take minimal steps "to assure that the defendant has a fair opportunity to present his defense" and must provide "'the basic tools of an adequate defense.'" Id. at 76, 77 (quoting Britt v. North Carolina, 404 U.S. 226, 227 (1971)).

In Waye v. Murray, 884 F.2d 765, 766-67 (4ᵗʰ Cir. 1989), the Fourth Circuit Court of Appeals rejected a petitioner's attempted constitutional claim of ineffective expert assistance:

> While it is true that the tack the petitioner takes in this case principally is to disclaim inadequate performance of his attorneys on the one hand, and claim inadequate performance of his psychiatrist on the other, we think that no such rule should be inaugurated, even in a capital case. It will nearly always be possible in cases involving the basic human emotions to find one expert who disagrees with another and to procure an affidavit to that effect from the second perspective witness. To inaugurate a constitutional or procedural rule of an ineffective expert witness in lieu of the constitutional standard of an ineffective attorney, we think, is going further than the federal procedural demands of a fair trial and the constitution require.

See also Harris v. Vasquez, 949 F.2d 1497, 1518 (9ᵗʰ Cir. 1990) ("Allowing such battles of psychiatric opinions during successive collateral challenges to a death sentence would place federal courts in a psycho-legal quagmire resulting in the total abuse of the habeas process."); Silagy v. Peters, 905 F.2d 986, 1013 (7ᵗʰ Cir. 1990) (rejecting petitioner's due process claim regarding competence of expert psychiatrists at trial).

In Alley v. State, 882 S.W.2d 810 (Tenn. Crim. App. 1994), this court cited the Waye holding with approval. In that case, our court ruled that "testimony to demonstrate the incompetence or negligence of . . . experts is inadmissible if presented in lieu of the constitutional issue of ineffective assistance of counsel." Alley, 882 S.W.2d at 817. It is our conclusion, therefore, that the defendant's claim of ineffective expert assistance is not a ground for relief.

Unlike the circumstances in Waye, however, the defendant also asserts a related claim of ineffective assistance of counsel. Our supreme court has stated that claims of ineffective assistance

of counsel may be raised on direct appeal and the same standard applies as in post-conviction proceedings. See State v. Burns, 6 S.W.3d 453, 461 n.5 (Tenn. 1999). When a defendant seeks relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the defendant fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a [defendant] must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the defendant is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). The defendant bears the burden of proving his claims by clear and convincing evidence. See Burns, 6 S.W.3d at 461 n.5; State v. William Makransky, No. E2000-00048-CCA-R3-CD (Tenn. Crim. App., at Knoxville, June 28, 2001); see also Tenn. Code Ann. § 40-30-210(f) (1997).

On appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the defendant to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990); Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). When reviewing the application of law to those factual findings, however, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001); see also State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

At the close of the motion for new trial hearing, the trial court found as follows regarding the defendant's claims of ineffective assistance as to Dr. Engum and trial counsel:

> [T]his [c]ourt would find that the mental health specialist was not incompetent. Maybe somewhat contradictory, but at the same time, the defense team, including

Doctor [E]ngum, had a difficult time in explaining the behavior of [the defendant] in some way that would fit into some diminished capacity in my opinion. He knew he was going there. He's clearly admitted that.

The difference is did he know what he was going to do or did he know he was violating the law. Well, it's just hard for the defense psychologist to explain it any other way and I don't think that was ineffective on his part nor incompetence on his part to sort of change. Maybe it wasn't clear to defense counsel exactly what he was going to say, but certainly didn't appear to me to be incompetent.

The allegation in ground two is that counsel was ineffective in not choosing [a] competent psychologist. Well, he didn't know that he might have had a problem until the trial testimony, so he cannot held to be ineffective for not choosing someone prior to that. And there's nothing to indicate to the court that he was ineffective in not asking for a continuance to get up more evaluations or for a mistrial or in any other way salvage the case. Not incompetent on that ground.

Parenthetically, the testimony of the two jurors during the hearing on the motion for new trial should not have been permitted. See Hutchison v. State, 118 S.W.3d 720, 740 (Tenn. Crim. App. 2003). Tennessee Rule of Evidence 606 provides in pertinent part as follows:

Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b). In State v. Blackwell, 664 S.W.2d 686 (Tenn. 1984), our supreme court adopted Federal Rule of Evidence 606(b), which it described as a codification of Tennessee law, as to the admissibility of juror testimony when the verdict's validity is under challenge. The Tennessee rule of evidence, which came into effect in 1989, is identical to the federal rule. None of the exceptions to the rule apply here. This court cannot consider the testimony on appellate review.

More importantly, the evidence supports the post-conviction court's determination that trial counsel was not ineffective for retaining Eric Engum to provide expert assistance in this case. The record reflects that Dr. Engum is a licensed clinical psychologist with significant experience. Dr. Pamela Auble, hired by the defendant for the motion for new trial, testified that Dr. Engum's education and training were "quite satisfactory." Prior to retaining Dr. Engum, trial counsel got

favorable references and determined him to be "an experienced witness with a long list of credentials." That there may have been some confusion between trial counsel and Dr. Engum with regard to the contents of his written report versus his trial testimony does not necessarily mean that trial counsel was ineffective. Furthermore, it is the duty of the appellant to prepare a complete and accurate record on appeal. Tenn. R. App. P. 24(b). Because Dr. Engum's written report is not included in the record on appeal, this court cannot compare its content to his trial testimony. Finally, through Dr. Auble, the defendant presented proof at the motion for new trial hearing that Dr. Engum's state-of-mind testimony did not "make any sense." No further explanation was given. As observed by the trial court, the defense team "had a difficult time in explaining the behavior of [the defendant] in some way that would fit into some diminished capacity." Perhaps there was a reason for that. In any event, the defendant is not entitled to relief on this ground.

II

Next, citing Tennessee Rule of Evidence 403, the defendant asserts that the state's attorney committed prosecutorial misconduct by cross-examining Dr. Engum regarding verdicts reached in other cases in which he had testified and his connection with the Board of Directors of East Tennessee Federal Defender Services. The state argues that the cross-examination was proper to show bias or prejudice.

Rule 403 of the Tennessee Rules of Evidence provides as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403. Generally, the propriety, scope, and control of cross-examination are left to the sound discretion of the trial court. Davis v. State, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948). Appellate courts cannot interfere with the exercise of that discretion absent a clear and plain abuse. See State v. Fowler, 213 Tenn. 239, 373 S.W.2d 460, 464 (1963); Coffee v. State, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948).

At trial, the state cross-examined Dr. Engum regarding his prior court appearances as an expert witness. The assistant district attorney questioned him regarding two specific prior cases in which the defendant in those cases had been convicted. The prosecutor also questioned Dr. Engum generally regarding the number of first degree murder cases in which he had testified and confirmed that he had been retained by the defense each time. With regard to Federal Defender Services, Dr. Engum acknowledged that he was on the Board of Directors "for an organization that works with defending persons charged with federal crimes."

At the close of the hearing on the defendant's motion for new trial, the trial court made the following findings as to this claim:

I don't think it was a violation of due process to challenge the credibility of the psychologist as a defense hired gun and that may have been what the approach was . . . . [I]t seems to me there might have been a challenge on the relevancy of those verdicts at trial, but I don't think the conduct of counsel rose to prosecutorial misconduct nor denial of due process . . . .

In our view, there was no prosecutorial misconduct during the cross-examination of Dr. Engum. Considered as a whole, the questioning indicates that the prosecutor was attempting to demonstrate bias on the part of the witness, a common and accepted cross-examination technique. That two of the cases in which he testified resulted in convictions would not have been relevant and would have merited exclusion. See Tenn. R. Evid. 401, 402. Nevertheless, it is apparent that this testimony did not affect the results of the trial. The error qualifies as harmless. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

In support of his argument regarding the admissibility of Dr. Engum's work with Federal Defender Services, the defendant cites State v. Hines, 919 S.W.2d 573 (Tenn. 1995). In Hines, the defendant was convicted of felony murder and sentenced to death. During the sentencing phase, the state's attorney cross-examined two defense experts as to their work with the Capital Case Resource Center and, in doing so, stated that the "'primary motivation or primary reason for . . . existence [of the Center was] to keep somebody from going to the electric chair.'" 919 S.W.2d at 580. During closing, the prosecutor argued that the Capital Resource Center's "'sole function in life [was] to fight against the death penalty regardless of the circumstances.'" Id. On appeal, our high court affirmed the sentence of death. In doing so, it observed that the comments of the state's attorney were improper expressions of opinion not supported by evidence in the record. Our supreme court held that when the comments came close to a denial of due process," the impropriety was cured by the trial court's diligence. Our high court also held that the prosecutor's statements did not result in an improper commentary on the defendant's exercise of his right to counsel:

A violation of defendant's right to counsel occurs when a prosecutor's examination of a witness or argument seeks to penalize the defendant for exercising his constitutional right. The cross-examination of [the defense experts] in this case sought to impeach the two witnesses by establishing pro-defendant bias on their part because they had worked with the Resource Center in the past, and by attacking the reliability of the information on which they had based their opinions because some of it had been obtained from the Resource Center. This line of cross-examination did not rise to the level of penalizing defendant's right to counsel by asking the jury to make a negative inference from the defendant's exercise of this right. The prosecutor sought to attack, not the defendant's use of an attorney or the facilities of the Resource Center, but in his view, the reliability and impartiality of the witnesses because of their attitudes toward capital punishment and the bias of the information on which their opinions were, at least in some part, based.

Id. at 580.

The concerns raised in <u>Hines</u>, however, do not control the case at issue. Here, the prosecutor was cross-examining Dr. Engum regarding his professional training. His association with Federal Defender Services was included on his curriculum vitae. The prosecutor did not make any personal commentary on the association and did not make reference to facts not introduced in evidence. Rather, the cross-examination was directed toward establishing a bias on the part of Dr. Engum in favor of the defense. <u>Hines</u> is distinguishable. In our view, the defendant is not entitled to relief on this issue.

Accordingly, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE