

FILED

05/11/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 4, 2017 Session

**STATE OF TENNESSEE V. TRAVIS SMITH**

**Appeal from the Criminal Court for Shelby County**
No. 11-05223      Glenn Ivy Wright, Judge
_____

**No. W2015-02360-CCA-R3-CD**
_____

A jury convicted the Defendant, Travis Smith, of rape of a child, a Class A felony, and he was sentenced to serve twenty-five years in prison. The Defendant appeals, challenging the sufficiency of the evidence, the trial court's decisions regarding the admission of testimony, the sufficiency of the bill of particulars, the timing of the State's election, the jury instructions regarding the election, the introduction into evidence of a videotape of the victim's forensic interview, and the State's alleged failure to turn over exculpatory evidence. The Defendant also asserts he is entitled to relief for cumulative error. Discerning no error, we affirm the Defendant's conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

James F. Schaeffer, Jr., and Robin L. Steward, Memphis, Tennessee, for the appellant, Travis Smith.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Katie Ratton and Joshua Corman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendant lived with his cousin, the victim's mother, for a period of months in 2010. During this time, the Defendant twice raped the victim, who was eight or nine

years old at the time of the offenses. After an absence of some months, the Defendant again spent the night at the victim's home. The victim revealed the abuse after the victim's mother discovered that the victim and Defendant were both out of bed in the early morning hours.

The Defendant was indicted for one count of rape of a child occurring between September 30, 2010, and November 1, 2010. On April 4, 2014, the State moved to amend the period of time during which the offense occurred to between May 15, 2010, and October 17, 2010, which was the period of time that the Defendant lived with the victim's family. The motion to amend the indictment was granted. The Defendant objected to the amendment of the indictment and also requested the State to file a written response to the Defendant's request for a bill of particulars. The Defendant argued that the bill of particulars would essentially have to tie the abuse to a particular date in order to allow the defense to prepare for trial.

The State filed a bill of particulars which detailed the testimony it anticipated the victim would give. The bill of particulars stated that the State could not specify an exact date or time for the offense. The State anticipated that the victim would testify that the Defendant woke her up in her bedroom one night during the time he was living with her family, told her to go to the living room, and kissed her and rubbed her back. The next time the Defendant woke her, he told her to go to the bathroom, undressed her, told her to lie on the floor and hold her legs up, and penetrated her vagina with his penis. The bill of particulars summarized the final incident by stating that the Defendant again woke the victim while she was sleeping in her bedroom, told her to go to the living room, undressed her, told her to lie on the floor and hold up her legs, and again penetrated her vagina with his penis.

Trial began June 8, 2015, and the Defendant stated that he was renewing his motion for a bill of particulars, arguing that the State had given only "generalities" and that the State should have to specify exactly when the crime occurred. On further discussion, the Defendant stated he was not renewing the motion, but "just basically it would be an election as to what we're proceeding on here when the alleged incident occurred." The trial court ruled that the State's election regarding the factual basis for the conviction could come at the close of the State's proof.

The victim testified that she was born on August 4, 2001, and that in 2010 she lived in a small house with her family. The permanent residents of the house were her mother and father, who shared a room, her older brother, who had his own room, and herself and her two younger sisters, who shared a room. In 2010, the victim normally slept on the top bunk in the girls' bedroom. At one point in 2010, the Defendant stayed with the family and slept in the living room.

- 2 -

The victim testified that one night, the Defendant came into her room, tapped her on the back, and called her nickname. The Defendant told her to go into the living room. No one else was awake. The victim testified that the Defendant's actions did not seem normal, but that her mother had taught her to obey adults. The victim sat on a couch and the Defendant started kissing her and rubbing her back. The victim was scared and thought she would get in trouble if anyone found out. The Defendant also told her that he would beat her with a belt if she told anyone, and she believed him. The Defendant told the victim to go back to bed, and she did not reveal what had happened to anyone.

Shortly after this, the Defendant again woke her the same way and told her to go into the bathroom and lie down on the floor. He entered the bathroom and locked the door. He took off her pants and underwear. The Defendant was wearing boxers but took them off. He told her to lift her legs after he had removed her clothes, then he held up her leg and penetrated her vagina with his penis. No one else in the house was awake. The Defendant told her to get dressed and go back to her room. The victim was not able to get back to sleep.

The last incident again began with the Defendant waking the victim up by tapping her back in the middle of the night. She almost began to cry when he woke her because she thought that he was "fixing to do it again." The Defendant, who was wearing socks and underwear, told her to go to the living room and take off her clothes. He told her to lie on the couch and got on the couch in front of her and raised her leg. He pulled his underwear down and again penetrated her vagina with his penis.

The victim testified that the Defendant left town for a while, but she was afraid he would return, and she did not reveal the abuse. By 2011, the victim and all her siblings were sleeping in the victim's brother's room in one bed.

On April 29, 2011, the victim saw the Defendant at a family party. She went into the house to use the bathroom, and he came into the bathroom with her, shut and locked the door, and started taking pictures of her. The victim asked to spend the night with her aunt because she knew that the Defendant had asked to stay at the victim's house. Accordingly, the victim was not at her home that night. The next day, the family met at another party, and the victim, the Defendant, and the victim's immediate family all went back to the victim's house to spend the night.

In the middle of the night, the Defendant came in and tapped the victim on the back and called her name. None of the victim's siblings woke up. The Defendant told the victim to go to the living room, and she did. The Defendant walked back and forth in front of the victim's mother's room, "holding the light down" from the telephone that he

had used to take her picture, "trying to see was [the victim's mother] up or was she [a]sleep."

At this point, the victim's mother opened her door and began to call the victim and her sister. The Defendant, who was standing in front of the victim's mother's room, ran into the bathroom, which was located next to that bedroom, and locked the door. The victim walked down the hall to her mother, and the victim's mother asked why she was out of bed. The victim told her mother that she was looking for some water she thought her father had left for her, but her mother responded that "that did not sound right," and asked, "what are you doing up[?]" The victim went into her mother's room and told her mother that the Defendant had woken her up. The victim's mother asked her if the Defendant had touched her, and the victim told her that he had done so but not on that night. The victim's mother called the Defendant out of the bathroom.

Because the victim's mother was afraid that her children would be taken from her care due to the lack of utilities, she did not call the police, but instead roused the whole family to drive to the hospital. The Defendant accompanied them. The next day, the victim went to the Child Advocacy Center ("CAC") and had a forensic interview. The interview was played for the jury and was largely consistent with the victim's testimony at trial. She affirmed that she told the truth in the interview and that the recording was a true and accurate depiction of the interview. The victim acknowledged that in the interview, she said the second rape occurred on the floor of the living room rather than on the couch. She stated that she could not remember which it was, but that she had told the truth in the interview and was telling the truth at trial.

On cross-examination, the victim acknowledged that she had known the Defendant her whole life, that he had babysat her and her siblings, and that he had never beaten her or her siblings with a belt or been violent with them. The victim did not remember what season it was when the Defendant committed the offenses against her, and she did not remember what grade she was in. She did not tell any of her friends, family, or teachers. Her grades did not change due to the assaults. The victim testified on direct examination that she was nine when the Defendant assaulted her, but she testified on cross-examination that she turned nine in August of 2010 and that she could not remember whether the assaults occurred in the spring, summer, or fall of that year, or whether she was still in the third grade or had started the fourth grade.

Prior to the victim's testimony, a court deputy informed the court that the victim had been waiting outside to testify and that she had told an attorney who was also waiting that a man with dreadlocks and a white t-shirt exposed his genitals to her outside the courtroom. The defense requested to "voir dire" the victim regarding the event, for the purpose of making a record, and sought to have the attorney also testify. The trial court

- 4 -

denied the request on the basis of relevance. At the end of the day, however, the trial court permitted the attorneys to summarize the event for the record. Defense counsel stated that the victim told an attorney that a man exposed his penis to her and that the attorney "observed nothing." Defense counsel stated that he wanted "to put her on and just ask her about those things" because it would go to her "credibility." The State responded that the attorney had said that he and the victim were in a "glassed-in" room and that the victim "started saying something to him to try to get his attention and she immediately went and backed up against a wall so that she was out of view." The victim told the attorney that a man was exposing himself to her. The prosecutor stated that the attorney saw an African American man with dreadlocks, that the attorney went to confront the man, and that the man ran away. The man was not apprehended. Defense counsel added that the attorney did not see the man "fiddling with his clothes." The trial court concluded that it would not permit the defense to "cross-examine" the victim about the incident because it was not relevant to trial.

The victim's mother testified that in 2010, she, her husband, and their four children lived in a house that had three bedrooms and one bathroom. On May 15, 2010, the victim's mother had a party to celebrate her own birthday, and the Defendant had nowhere to go after the party, so she let him stay at her house. The Defendant stayed at the victim's mother's house "off and on" from May 15, 2010 until October 16, 2010, and he slept mainly in the living room and occasionally in the victim's brother's room. At the time the Defendant lived with the family, the victim slept on the top bunk in one of the bedrooms. The Defendant moved out of the home on October 16, 2010, but he returned for Christmas. He left town in early January 2011 to go to California.

The victim's mother next saw the Defendant at a family gathering on April 29, 2011. The Defendant asked if he could spend the night with her, and after warning him that she had no utilities, she allowed him to come. She could not recall if the victim overheard this conversation, but she testified that the victim then asked if she could spend the night with her aunt. That night, the Defendant and the victim's grandmother stayed in the living room of the home, and the victim stayed with her aunt.

The next day, the entire family attended a birthday party. The victim's grandmother went to spend the night elsewhere after the party. At around 10:30 or 11:00 p.m., the family, including the victim and Defendant, returned to the house.

The victim's mother testified that at some point in 2010, the victim and one of her sisters wet the bed. The victim's mother eventually had to dispose of the mattresses on the bunk bed, and the children all began sleeping in one room. By the time the Defendant stayed with the family in 2011, all four children slept in one bed in the

victim's brother's room. The victim's mother would wake up the victim and her sister every night to ask them to use the bathroom in order to prevent bedwetting.

The victim's mother testified that her utilities were cut off sometime in September or October 2010. She had a generator that functioned from the end of 2010 to the beginning of 2011. The victim's mother habitually slept with the television on and the volume up when she had electricity, but by April, there was no power in the house. The victim's mother used two kerosene lanterns for light, one placed in the bathroom and one in her bedroom. After the utilities were cut off, the family began to keep a large plastic tub of water in the bathroom and used buckets of water from the tub to flush the toilet.

The victim's mother testified that the victim and her siblings were asleep together that night. The Defendant came to her door and asked her for a cigarette, and she gave him one. He came again an hour later to ask for another cigarette. The victim's mother did not have any to spare, so he asked her for cigarette butts and she gave them to him. The victim's mother was on the telephone with her friend, but she "kept hearing noises" in the house. Around 1:00 or 2:00 a.m., she decided to wake the children to ask them to use the bathroom. The victim's mother opened the door to go into the hallway, and as she did, she saw "a flash run by." It looked to her as though someone had run out of her son's room, which was directly across the hall, and into the bathroom, and she heard the bathroom door shut and lock. She called her two older daughters' names, and Defendant asked her if she wanted him to get the children up and let them use the bathroom. She told him that she would get them up. She called their names again, and her younger daughter answered from the bedroom, but the victim did not respond. She then saw the victim walking up the hallway. She asked the victim why she was up, and the victim responded that she thought her father had left some water out for her. The victim's mother found this suspicious because her children did not "get[] up in the middle of the night without someone waking them up."

The victim pulled her mother into the victim's mother's bedroom and told her that the Defendant had woken her up. After speaking to the victim, the victim's mother called the Defendant out of the bathroom and woke her husband. The Defendant denied any wrongdoing. He told her that he had woken up her son to ask him for a blanket. The victim's mother then woke her son, who said that the Defendant never asked him for a blanket. She also testified that the Defendant did not ask her for a blanket either time he knocked on her door and that the Defendant knew where she kept the linens because he had stayed with her for an extended period of time. The victim's brother testified that the Defendant had asked him about a blanket earlier in the day, while it was daylight, but that the Defendant never woke him to ask for a blanket.

The victim's mother did not want to call the police because she was afraid her children would be taken from her care due to the lack of utilities, so she took everyone to the hospital. She identified photographs of her home, noting that a large plastic tub taking up much of the space in the bathroom had not been there in 2010.

On cross-examination, the victim's mother testified that the Defendant had stayed with her off and on since he was fifteen, that he had babysat for her, and that she had never had a problem with him. The victim's mother also testified regarding various other people who stayed with her during the relevant timeframe. In 2010, the victim's grandmother lived there "off and on," and the Defendant's brother Dexter Smith lived with the victim's family until June 2010. The victim's mother had a brother, Norman McDowell, who had stayed with her beginning in February 2010, but who was arrested on May 16, 2010. Defense counsel asked the victim's mother if Mr. McDowell had been "locked up for committing rape of a child in [her] house," and the victim's mother responded she did not know. The State objected based on relevance. Defense counsel stated that Mr. McDowell, the victim's uncle, had participated in a robbery and had raped his fourteen-year-old accomplice in the house. The trial court concluded that any evidence regarding Mr. McDowell's crimes was not relevant, but the court refused to give curative instructions.

The victim's mother testified that, at the hospital, she spoke to police officers. At one point, they asked her what the Defendant was wearing and she told them. They informed her later that they "got him." The victim's brother testified that he went to the hospital with his family. As soon as deputies arrived, the Defendant left, saying that he was going to get cigarettes. The Defendant was not running but using a "speed walk" as though he were "trying to get away without being noticed." The Defendant was acting unusual in that he appeared nervous and was shaking his leg fast. The victim's brother acknowledged that the Defendant was a smoker and that the Defendant had babysat him and his siblings and had never beaten them, hurt them, or threatened them.

Sergeant Thomas Griffin of the Memphis Police Department responded to the hospital to investigate a sexual assault. He stated that he did not interview the minor victim because department policy dictated that the victim should be interviewed by a trained forensic interviewer. Sergeant Griffin was advised that the Defendant was at the hospital, and uniformed officers took the Defendant to the police station. The Defendant's written statement was introduced into evidence. In his statement, the Defendant asserted that he got up at 3:00 a.m. because he was cold. He searched for a blanket around the house and then went into the children's room. The Defendant stated that the children had two blankets in their room. He acknowledged that he tried to wake up the victim but stated that she "didn't budge." He left the room and found another blanket. As he was getting ready to lie down, he decided to use the bathroom. From the

bathroom, he heard the victim's mother call the girls and heard her ask the victim why she was up. The Defendant stated that he had not been aware that the victim had gotten out of bed prior to overhearing the victim's mother talking with her. The victim's mother then asked him if he had told the victim to lie down with him in the living room, and he denied it, telling her that he had tried to wake the victim in order to get one of the children's blankets but that she had not woken. He stated that "[b]efore then" he had spoken with the victim's brother to ask if there were any clean blankets, but the victim's brother had said none of them were clean, so the Defendant "lay[] back down without a blanket." He clarified that he asked the victim's brother for a blanket before he went into the room where the children were. The Defendant denied ever inappropriately touching the victim. He stated that the victim's accusations were a lie and that the victim's mother was "pressuring her" to accuse him of rape.

Sergeant Griffin acknowledged that as far as he knew, the Defendant was taken into custody without a struggle or chase. The Defendant was arrested in the parking lot.

Ms. Patricia Lewis of the CAC testified that she interviewed the victim on May 2, 2011. Sergeant Griffin was in another room listening to the interview. The victim made a disclosure of abuse using anatomical drawings. Ms. Lewis testified that after she had spoken to the victim about the abuse, Sergeant Griffin requested through a headset that she ask some follow-up questions, and she did. She stated that she frequently declines to ask follow-up questions suggested by police if she thinks the questions are not appropriate. She stated she did not know if the victim had disclosed the abuse to anyone else first, and affirmed that it would be important for the victim's statements not to be "tainted," but she testified that she conducts the interview in a neutral way.

Dr. Karen Lakin, an Assistant Professor of Pediatrics at the University of Tennessee, testified regarding the physical examination of the victim at the hospital. Dr. Lakin testified that while the examination did not reveal any injuries or abnormalities, this finding was consistent with the victim's disclosure of rape. She explained that hymenal tissue heals very quickly and generally would not be "permanently broken" even if the victim's vagina had been penetrated. She noted that a study of thirty-six pregnant teenagers showed that only two had changes to hymenal tissue. Dr. Lakin concluded that the findings would support the victim's disclosure because she would not expect to see an injury unless the child were examined immediately after the assault. She agreed that the report stated that the physical examination could not either confirm or disprove the disclosure of assault. She acknowledged that the victim did not suffer from injury or sexual transmitted disease, and she stated there was no effort to recover DNA evidence due to the length of time that had passed since the assault. She testified that the victim's mother told the hospital that the victim had a history of bedwetting which was relatively

recent or new, and that bedwetting in an older child can be associated with bladder irritation or irritation of the vaginal area and might be a symptom of sexual abuse.

At the close of the State's proof, the State elected to prosecute the Defendant based on the victim's testimony of the rape that occurred on the bathroom floor. The defense objected, citing a "lack of notice."

The Defendant elected to testify. He stated that he was thirty-two years old at the time of trial and was the cousin of the victim's mother. According to the Defendant, approximately five adults lived at the victim's home in 2010: the victim's mother and father, Mr. McDowell, the victim's grandmother, and the Defendant's brother, Dexter Smith. In 2010, the Defendant stayed with the victim's family "from time to time." He testified that he was not there "that much" between May and October and that "it was impossible for [him] to have been raping her and then leaving and doing all these things at the same time." Contrary to other testimony, he stated that he "mostly" did not sleep in the living room, that he shared a room with the victim's brother, and that his brother, Mr. McDowell, and the victim's grandmother "slept in the living room all the time." He later agreed that he and the victim's brother slept in the "back room" "[e]very time" and testified that he "always" spent the night in the victim's brother's room and that the first time he slept on the couch was in April 2011. He stated that he was never the only guest staying in the house.

The Defendant testified that he had babysat the children and never threatened them in any way; he, in particular, never threatened to whip or beat them. He testified that he did not generally discipline the children but would tell their mother if they were disobedient. According to the Defendant, three of the children were "well-mannered" and obedient, but the victim was difficult because she wanted to watch videos, put on makeup, and go outside and "play with boys." He stated that she would "lick her tongue out at" him or roll her eyes and tell him that he could not tell her what to do.

The Defendant denied ever waking up the victim during 2010 or taking her to the living room. He stated that there were five adults sharing the house. He said that the walls were thin and that noises could be heard from room to room, but he also testified that if the television was loud, noise from another room would not come through. He testified that the house had window units in the victim's mother's bedroom and the living room.

The Defendant acknowledged asking the victim's mother for cigarettes twice the night the victim disclosed the abuse. He testified that he got up that night because he was cold. He got a cigarette first, then looked for a blanket. He went into the victim's brother's room to find a blanket, but when he saw that the girls were also sleeping there,

he "exited the room immediately." When cross-examined about his statement that he tried to wake the victim in search of a blanket, he stated that he did try to wake her for the blanket and that he "had every right to go in there because that's where I used to sleep in this house all the time." The Defendant claimed that he had never entered the room where the girls had previously slept because he "would have no reason to go in a little girl['s] room" and therefore did not know if there would be blankets there. He also stated that the victim's mother would get up in the middle of the night and sometimes wake the children to use the bathroom. He denied running past the victim's mother at night. Instead, he stated he lay down for thirty minutes with a blanket and then got up to use the bathroom.

The Defendant's theory of events was that the victim got out of bed "for whatever reasons" and then "had to lie her way out of it" by accusing him of sexual assault. He acknowledged that the air conditioning units in the windows and the television worked in 2010, but stated that if he had committed an assault, the victim "should have screamed." He stated he was "stunned" when the victim's mother confronted him. He testified that he urged her to "act on" the victim's statements but that she did not notify anybody, instead taking her family to the hospital.

The Defendant stated that he was in the hospital lobby with the children and told the victim's brother to tell the victim's mother and father that the Defendant would be in the car. He rolled cigarettes from butts in the car and then dozed off for ten to fifteen minutes. He was then arrested.

The Defendant also denied taking photographs of the victim at the party. He stated that the police took his telephone when he was arrested and that he never saw it again. He "suppos[ed]" that the telephone was taken as evidence and not secured with his personal property. The Defendant agreed that the victim, the victim's mother, the victim's brother, and Sergeant Griffin were lying, "as well as absolutely everybody else" who testified.

The Defendant's brother, Dexter Smith, testified on the Defendant's behalf. Mr. Smith said that he had six daughters ages two to twenty-four and that the Defendant had spent time around all except the youngest. He stated that he trusted the Defendant with his children. Mr. Smith testified that the Defendant had "naturally" been in his girls' room playing and talking with them. Mr. Smith denied ever having spoken to the victim's mother regarding a letter the Defendant wrote in which he stated "he did something really bad and he feels bad about it." He knew nothing about such a letter.

Mr. Smith, who stayed with the victim's family in 2010, testified that he, the victim's grandmother, and Mr. McDowell "sometimes" slept in the living room while the

Defendant slept in the victim's brother's room. However, sometimes they "swapped out," and the Defendant slept in the living room while either he or Mr. McDowell slept in the victim's brother's room. He testified that there were times when the Defendant was the only person outside the immediate family to spend the night in the home.

The jury convicted the Defendant of rape of a child, and he was sentenced to serve twenty-five years in prison. The Defendant moved for a new trial, asserting that the evidence was insufficient to support the verdict, that the indictment should not have been amended to expand the timeframe, that the State's election made at the close of proof provided insufficient notice, that the forensic video should not have been introduced into evidence, that the trial court erred in admitting testimony regarding the photographs when the photographs and telephone were not produced in discovery, that the trial court erred in admitting the testimony of Dr. Lakin, that the trial court erred in failing to order a written bill of particulars, that the telephone was improperly withheld exculpatory evidence, and that the court erred in denying the Defendant the right to "cross-examine" the victim regarding the incident outside the courtroom. At the motion for a new trial, defense counsel stated that co-counsel had gone to the property and evidence room at the police station and was not able to find the Defendant's cellular telephone. Defense counsel also stated that he had issued a subpoena for the telephone without result. The trial court denied the motion for a new trial without analysis or factual findings, and the Defendant appeals.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence supporting the verdict. He asserts that there was no physical evidence of the assault, that the victim's testimony is uncorroborated, and that without physical evidence or corroboration, the evidence is legally insufficient.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A jury's verdict of guilt, approved by the trial court, resolves conflicts of evidence in the State's favor and accredits the testimony of the State's witnesses. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005).

To establish the elements of rape of a child as charged in the indictment, the State was required to prove that the Defendant committed the unlawful sexual penetration of the victim and that the victim was more than three years old but less than thirteen years old. T.C.A. § 39-13-522(a) (2010). Sexual penetration includes sexual intercourse "or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's" body. *Id.* § 39-13-501(7).

Here, the victim testified that she was between eight and nine years old when the Defendant stayed with her family for a period of months. During this time, the Defendant woke her in the middle of the night on three occasions, and on one of these occasions, he told her to go to the bathroom, locked the door, took off his clothing and hers, made her lie down, held up her leg, and penetrated her vagina with his penis.

The bulk of the Defendant's brief regarding the sufficiency of the evidence does not address sufficiency. Relevant to the issue, the Defendant does argue that the evidence is insufficient because there was no physical evidence and the victim's testimony was uncorroborated. Physical evidence is not necessary to uphold a conviction. *State v. Bradley Cox*, No. W2014-00800-CCA-R3-CD, 2015 WL 3796463, at *8 (Tenn. Crim. App. June 17, 2015), *perm. app. denied* (Tenn. Nov. 24, 2015) ("Although not necessary to uphold a conviction, this testimony was corroborated by the physical evidence in the case."); *State v. Tamaine Works*, No. W2005-01048-CCA-R3-CD, 2006 WL 1491636, at *12 (Tenn. Crim. App. May 26, 2006) (concluding, in a murder case, that "the Defendant's emphasis on the lack of physical evidence in his case is misplaced, as such evidence is not required to uphold a jury verdict"). Dr. Lakin testified that she saw no injury in the victim and would not expect to see an injury given the amount of time that had passed since the assault. While physical evidence of the assault is not necessary to uphold the conviction, the State nevertheless presented physical evidence that the victim was sleeping in a bunk bed at the time the Defendant stayed at the home, that she began to wet the bed to the point that the mattress had to be discarded prior to 2011, and that bedwetting in an older child can result from vaginal irritation and can be a sign of sexual abuse.

The Defendant is also mistaken in his assertion that the victim's testimony needs corroboration. "Generally, a defendant may be convicted upon the uncorroborated testimony of one witness." *State v. Wyrick*, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). "[T]he testimony of a child victim, alone, is sufficient to uphold a conviction for child rape." *State v. Phillip Smith*, No. W2013-02280-CCA-R3-CD, 2014 WL 4072113, at *7 (Tenn. Crim. App. Aug. 18, 2014). Accordingly, the victim's uncorroborated testimony is sufficient to uphold the verdict. However, the State's evidence also included corroboration of various aspects of the victim's testimony, including the testimony of the victim's mother that she found the victim and the Defendant awake late at night in her home, that the Defendant ran into the bathroom when she emerged from her room, and that the victim would not have been awake unless someone had woken her. The victim's brother disputed the Defendant's statement that the Defendant had woken him to look for a blanket. Dr. Lakin testified that the victim's bedwetting could be a symptom of sexual assault. The Defendant, on the other hand, gave inconsistent versions of events, stating both that he tried to wake the victim and that he left the room immediately when he realized that the girls were in their brother's room. The Defendant's testimony regarding who was staying at the house and where he slept was contradicted by several witness, including his brother, and the victim's brother testified that the Defendant began to act nervous and left as soon as the police arrived at the hospital. The evidence showed that, during the time of the rape, the victim's mother slept with the television on and with a window unit air conditioner. Although there was in fact corroboration of various aspects of the victim's testimony, the victim's testimony alone was sufficient to establish the elements of the offense. We conclude that the evidence is sufficient to support the verdict.

## II. Decisions Regarding the Admission of Testimony

We address the other arguments raised in the Defendant's brief but not delineated by subject headings to the extent that we conclude they are not waived and to the extent that we are able to decipher them. The State argues that these issues are waived for failure to include them in the headings but that they are in any case are not meritorious. *See Mobley v. State*, 397 S.W.3d 70, 104 (Tenn. 2013) ("As a result, an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4).").

A trial court's decisions regarding the admissibility of evidence are generally reviewed for abuse of discretion. *State v. Parker*, 350 S.W.3d 883, 896-97 (Tenn. 2011). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).

- 13 -

## A. Testimony Regarding Indecent Exposure

During trial, a deputy informed the court that the victim been waiting outside the courtroom in order to testify and that she had told an attorney that a man exposed his genitals to her. The man was not apprehended. After a brief break, the Defendant requested to "voir dire" the victim for the purpose of creating a record of the incident outside the courtroom:

> [DEFENSE COUNSEL]: ….And just the circumstances and I would like to be able to voir dire [the victim] on this issue of what she saw, when she saw, what she saw these accusations that she's made and obviously do that outside –
>
> THE COURT: For what purpose?
>
> [DEFENSE COUNSEL]: Just to kind of make a record, I guess, Your Honor, so during the course of this trial if she's seeing things….

The trial court denied this request, concluding that the evidence would not be relevant to the trial. At the close of proof on the first day of trial, the defense again raised the issue. The trial court noted that it had denied the "motion to make a record" but would allow counsel to make a statement about the incident. Trial counsel gave a version of the events that occurred outside the courtroom, stating that the attorney who was sitting near the victim did not see anything. The trial court asked if counsel "wanted to ask the victim about that," and counsel replied that he "wanted to put her on and just ask her about those things because there's certainly credibility I think involved." The State then elaborated on the incident, stating that the attorney saw a man in the hallway, that the attorney attempted to confront the man, and that the man ran away. The trial court stated that defense counsel would not be able to "cross-examine the victim about it." In the motion for a new trial, the Defendant raised as error the fact that he was not allowed to "cross-examine" the victim regarding the incident.

While it appears that the Defendant's initial request was to merely "voir dire" the victim, presumably outside the presence of the jury, to create a record of the event, it also appears that the trial court, in revisiting the issue later that day, ruled that the defense could not "cross-examine" the victim, presumably in front of the jury, regarding the event. The Defendant raises for the first time on appeal the argument that he was denied his right to confront witnesses. The Defendant's brief cites to no law, beyond the Tennessee Constitution, relevant to a violation of the Confrontation Clause, but instead cites to the legal standards regarding the admissibility of evidence and relevance. We conclude that any claim under the Confrontation Clause is waived. Tenn. Ct. Crim. App.

R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

While the entire issue, which was shoehorned into the sufficiency section of the brief and initially raised as a request to make an offer of proof, teeters on the edge of waiver, we will address it insofar as the trial court denied the request to introduce proof at trial through the victim's testimony regarding the indecent exposure. The trial court excluded the testimony regarding a man exposing his genitalia to the victim on the basis of relevance.

In order to be admissible, evidence must first be relevant. Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. Like other decisions regarding the admissibility of evidence, decisions regarding the relevance of evidence are reviewed for abuse of discretion. *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *State v. Watson*, 227 S.W.3d 622, 649 (Tenn. Crim. App. 2006). The fact that the victim in this case was, five years after the offense, also the victim of an indecent exposure does nothing to make it more or less probable that the Defendant raped her when she was eight or nine years old. Neither does the incident, as the Defendant claims, reflect on the victim's credibility, since there is nothing in the record to suggest that the victim was untruthful about what happened outside the courtroom. The trial court properly excluded the testimony as irrelevant.

### B. Evidence Regarding Mr. McDowell's Criminal History

The Defendant likewise claims that the trial court erred in excluding testimony that the victim's uncle, Mr. McDowell, committed the crime of aggravated rape with a weapon against a fourteen-year-old girl prior to the time that the Defendant began to live with the family. *See State v. Norman McDowell*, No. W2014-00301-CCA-R3-CD, 2015 WL 554873, at *2 (Tenn. Crim. App. Feb. 10, 2015).

The defense asked the victim's mother to list the other people living at her home while the Defendant was there, and she stated that her brother, Mr. McDowell, lived there but was arrested on the day after her May 15, 2010 birthday party, which was the day the Defendant began to reside at her home. Defense counsel asked whether Mr. McDowell was arrested because he had committed rape of a child in her home, and she answered that she had "no … idea to that." The State objected, noting that Mr. McDowell had not been charged with rape of a child because his victim was fourteen and that there was no

- 15 -

evidence tying his crime to the offenses against the victim in this case. The defense argued that it was relevant because the victim's mother "could be making this story up … to protect her brother."

We reiterate that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Here, the fact that the victim's uncle was living with the family and raped a fourteen-year-old girl at gunpoint on May 10, 2010, does not make it any more or less likely that the Defendant raped the eight- or nine-year-old victim at some point between May 15, 2010, and October 17, 2010. The Defendant's speculation that the victim's uncle was the actual offender and that the victim and her entire family decided to cast the blame on him has no basis in the evidence included in the record. The crime that the victim's uncle actually committed is not relevant to the question of whether the Defendant raped the child victim. *See State v. Rogers*, 188 S.W.3d 593, 613 (Tenn. 2006) (concluding that trial court properly denied the defendant the opportunity to cross-examine the child victim's brother regarding whether he had had intercourse with her because it was "mere speculation" that the victim's brother could be the source of a semen stain and the evidence was therefore irrelevant). The trial court properly excluded the evidence.

## C. Evidence of Prior Bad Acts

In the section of his brief regarding the bill of particulars, the Defendant raises, as an extraneous issue, that the trial court erred in allowing proof of other bad acts. In particular, the Defendant objects to evidence regarding the two days that the Defendant stayed with the victim's family in 2011; this evidence focused on the circumstances of the victim disclosing the abuse. The Defendant objected to this anticipated evidence at a pre-trial hearing, and the trial court concluded that the evidence was necessary to show the circumstances of disclosure.

The Defendant does not specify which parts of the evidence regarding the events from 2011 he finds objectionable. While the Defendant argued at the pretrial hearing that all the events of 2011 should be excluded based on relevance, he did not present the trial court with the argument that any of the events consisted of "bad acts" requiring a hearing under Rule 404(b). Instead, defense counsel's statement to the court was that in 2011, "Nothing happened. Somebody was sitting on the couch." We agree that the bulk of this evidence did not constitute bad acts which could be analyzed under Rule 404(b). *See State v. Clark*, 452 S.W.3d 268, 289 (Tenn. 2014) (holding that the Rule applies only to "bad acts" and that behavior which, while not criminal, constitutes a "moral 'wrong'" must meet the strictures of the Rule); *State v. Reid*, 213 S.W.3d 792, 814 (Tenn. 2006). We do observe that the victim also testified that the Defendant came into the bathroom

with her during this timeframe "and started taking pictures." This testimony was not elicited by the State but was volunteered in response to the prosecutor's question regarding whether the Defendant spoke to the victim that night. No further details regarding the event were introduced, including whether the victim was clothed or what part of her body the Defendant photographed, and the Defendant did not object to the testimony at trial. *See* Tenn. R. Evid. 103 (noting that error may only be predicated on the admission of evidence where "a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context" and a substantial right of the party is affected).

In the motion for a new trial, the Defendant likewise did not argue that any evidence regarding his 2011 stay with the family was improperly admitted under Rule 404(b). The Defendant raised the issue that the testimony regarding him taking pictures was admitted in error "where no cell phone or photographs as alleged were produced by the State prior as a part of discovery, either prior to or during trial." Accordingly, the Defendant never challenged the admission of any of this testimony under Rule 404(b) either at trial or in the motion for a new trial.

The Defendant's appellate brief does not argue that the testimony regarding the pictures was admitted in error. Instead, he merely asserts that unspecified "other bad acts" from April and May 2011 should have been excluded under Tennessee Rule of Evidence 404(b). We conclude that any challenge to the testimony of the events that occurred in 2011 is waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 3(e) ("Provided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence … unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.").

The Defendant cites to *State v. Rickman*, 876 S.W.2d 824, 829 (Tenn. 1994) for the proposition that exclusion of evidence under Rule 404(b) is not applied strictly in cases of child sexual abuse, but he does not specifically argue that the victim's testimony regarding the time the Defendant woke her in the middle of the night and kissed her and rubbed her back or that the victim's testimony regarding the Defendant's rape in the living room were improperly admitted as prior bad acts. While prior bad acts are generally not admissible, "this general prohibition has been relaxed in the sex crimes context, specifically in cases where the defendant is alleged to have committed sexual offenses over a lengthy period of time against young children who are often unable to

- 17 -

identify the dates on which particular acts were perpetrated." *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016). "'[W]here [an] indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible.'" *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015) (quoting *Rickman,* 876 S.W.2d at 828). This is to allow the State to prosecute crimes against young children who may not be able to identify the specific date of an offense. *Id.* at 424. Accordingly, insofar as the issue is not waived, we observe that this proof was also properly admitted. The Defendant is not entitled to relief based on the admission of any testimony of the Defendant's prior bad acts.

### D. Relevance of Circumstances Surrounding Disclosure

The Defendant also challenges on the grounds of relevance the testimony regarding the "events surrounding April 30 - May 1, 2011," arguing that the evidence is irrelevant to the rapes committed many months prior to the disclosure. The Defendant raised this issue at trial but did not raise it in his motion for a new trial, and it is accordingly waived. *See* Tenn. R. App. P. 3(e). We note in any event that while the Defendant challenged the evidence as irrelevant, the trial court properly found the evidence relevant to the circumstances of the victim's disclosure. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Here, the evidence was relevant to assist the jury in understanding why the victim disclosed the abuse approximately six months after the Defendant had left the home. *See State v. Marcus Smartt*, No. M2014-01093-CCA-R3-CD, 2015 WL 3563024, at *8 (Tenn. Crim. App. June 9, 2015) (evidence pertaining to victims' disclosure was relevant because it bore on their credibility); *see also State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn. 2000) (holding that even evidence of other crimes may be admissible "when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case"); *State v. Larry Michael Berkley*, No. W2015-00831-CCA-R3-CD, 2016 WL 3006941, at *10-11 (Tenn. Crim. App. May 17, 2016), *perm. app. denied* (Tenn. Sept. 23, 2016) (allowing victim's testimony regarding the triggering event which prompted him to disclose the abuse, despite the fact that the event included evidence of the Defendant's other crimes).

### III. Bill of Particulars

The Defendant next asserts that the bill of particulars was not particular enough to satisfy due process. The bulk of this section of the brief is devoted to an argument that the trial court erred in allowing proof of the Defendant's other crimes against the victim

and the circumstances surrounding the victim's disclosure of the rapes. The Defendant cites no authority for the proposition that the bill of particulars was inadequate, and the Defendant makes no argument to demonstrate that the State's rather detailed filing regarding the anticipated testimony was inadequate. *See State v. Byrd*, 820 S.W.2d 739, 740-41 (Tenn. 1991) (noting in a case of child sexual abuse that the bill of particulars need not include specific dates but should be specific enough to allow the defendant to prepare a defense, prevent undue prejudicial surprise, or provide inadequate protection against double jeopardy); *see also State v. Sherman*, 266 S.W.3d 395, 408-09 (Tenn. 2008) (the bill of particulars functions (1) to provide details of the offense to assist in preparation for trial; (2) to prevent prejudicial surprise at trial; and (3) to enable the defendant to preserve a plea for double jeopardy, and lack of specificity is not reversible unless the defendant can demonstrate prejudice); Tenn. R. Crim. P. 7(c) ("On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged."). This issue is waived for failure to support it with legal argument or citations to authorities, but it is in any event meritless. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

## IV. Timing of the Election

The Defendant cites no legal authority for the proposition that the State must elect an offense prior to the close of its proof, and none exists. *See, e.g., State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015) ("The State … must elect at the close of its case-in-chief the particular offense for which it is seeking a conviction."). This is because the requirement of election is premised on a circumstance in which "the prosecution *presents evidence to the jury that tends to show more than one criminal offense*, but the underlying indictment is not specific as to the offense for which the accused is being tried." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) (emphasis added). This issue has been waived and is in any event without merit. Tenn. Ct. Crim. App. R. 10(b).

## V. Jury Instructions Regarding Election

The Defendant next asserts that the jury instructions regarding the election of offenses were in error because the trial court did not give the "modified unanimity instruction" required in cases of "'generic' evidence" set forth in *State v. Qualls*, 482 S.W.3d 1, 2 (Tenn. 2016). Whether the jury instructions related to election were proper is a question of law reviewed de novo. *Id.* at 8. The Defendant acknowledges that he did not object to the instructions but requests plain error review. Because the Defendant cannot establish that a clear and unequivocal rule of law was breached, he is not entitled to relief. *See State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*,

899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (holding that one requirement of plain error relief is a showing that a clear and unequivocal rule of law was breached)).

Generally, the right to a trial by jury guarantees that a verdict rests on the jurors' unanimous conclusion that the defendant committed one particular criminal act. *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001). Accordingly, when evidence of multiple instances of unlawful sexual contact is introduced, the State must elect the specific conduct which forms the basis of the conviction. *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015). The election requirement enables a defendant to prepare for trial, protects against double jeopardy, and allows the trial and appellate court to review the sufficiency of the evidence. *Kendrick*, 38 S.W.3d at 568. The State is not required to identify the particular date that the offense occurred because the time of an offense is immaterial to bringing the indictment and because in cases involving young children, such as the one at bar, the victim may not be able to pinpoint the exact timing of the abuse. *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). Instead, the State may elect to identify a particular type of abuse or may base the election on "unique surroundings or circumstances that help to identify an incident." *Id.* at 138. The circumstances might include reference to a meaningful date or event such as a birthday, but "[a]ny description that will identify the prosecuted offense for the jury is sufficient." *Id.* When the victim is only able to give "generic evidence" of a pattern of repeated abuse without differentiating the instances of abuse, the jury should receive a modified unanimity instruction which instructs the jury that it must unanimously agree that the defendant committed all acts described by the victim. *Qualls*, 482 S.W.3d at 17. This approach does not, however, apply "[w]here the prosecution presents non-generic evidence of distinguishable criminal acts." *Id.* at 16.

The proof in this case established that the Defendant lived with the victim's family "off and on" from May 15, 2010 to October 17, 2010. The victim turned nine on August 4, 2010, and she was in the fourth grade that fall. The victim testified that during the time that the Defendant lived with her family, he woke her in the middle of the night three times. The first time, he kissed her and rubbed her back. The second time, he raped her on the bathroom floor. The third time, he raped her in the living room, but she could not recall whether the rape occurred on the couch or on the floor. The State elected to submit to the jury as a basis for the conviction the rape which occurred on the bathroom floor. The Defendant argues that because the victim was unable to recall when the offenses took place by reference to her birthday, school year, the season, or a holiday, the election and jury instructions were inadequate. The Defendant misunderstands the nature of generic evidence. Here, the State presented "non-generic evidence of distinguishable criminal acts," *id.*, and the victim gave testimony regarding "unique surroundings or circumstances that help to identify" the three separate incidents, *Shelton*, 851 S.W.2d at 138. The State properly elected one of the distinct offenses supported by the victim's testimony, and there is no possibility that some jurors convicted based on the rape that

occurred in the living room while others convicted based on the rape that occurred in the bathroom, because the instructions clearly instructed the jury to consider only the rape that occurred in the bathroom. There was no error in instructing the jury.

## VI. Forensic Interview

The Defendant objects to the introduction of the forensic interview of the victim during the State's case-in-chief, arguing that the recorded interview could only be admitted as a prior consistent statement to rehabilitate the victim's credibility after impeachment. A decision regarding the admissibility of evidence is reviewed for abuse of discretion. *State v. Parker*, 350 S.W.3d 883, 896-97 (Tenn. 2011).

The Defendant contends that under *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015), the trial court erred in admitting the recording on direct examination. However, as the State correctly notes, the statement here was admitted under Tennessee Code Annotated section 24-7-123, which provides that:

> Notwithstanding any provision of this part to the contrary, a video recording of an interview of a child by a forensic interviewer containing a statement made by the child under thirteen (13) years of age describing any act of sexual contact performed with or on the child by another is admissible and may be considered for its bearing on any matter to which it is relevant in evidence at the trial of the person for any offense arising from the sexual contact if the requirements of this section are met.

T.C.A. § 24-7-123(a). The parties in this case held a pretrial hearing on the admissibility of the video recording. The Defendant stipulated that the forensic interviewer met the requirements of Tennessee Code Annotated section 24-7-123(b)(3). The victim testified under oath that the video was a true and correct recording of the events, and she was available for cross-examination at trial. *See id*. § 24-7-123(b)(1). The trial court determined that the recording possessed particularized guarantees of trustworthiness. *See id*. § 24-7-123(b)(2). The Defendant relies on *Herron*, but *Herron* specifically noted that the statute did not apply because the victim in that case was above the age required by the statute at the time she was interviewed. *Herron*, 461 S.W.3d 890, 904 n.11. We conclude, and the Defendant does not contest, that the statutory requirements were met, and accordingly the video recording of the victim's forensic interview was properly admitted under Tennessee Code Annotated section 24-7-123.

## VII. Exculpatory Evidence

The Defendant argues that the State failed to turn over exculpatory evidence in the form of his cellular telephone. The State responds that the Defendant has not met his burden to show that exculpatory evidence was withheld in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In *Brady*, the United States Supreme Court held that the suppression of evidence favorable to the defendant is a due process violation where the evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87. In order to establish a violation based on the withholding of favorable material, the defendant must demonstrate: (1) that the defendant requested the information or that it was obviously exculpatory; (2) that the State suppressed evidence in its possession; (3) that the information was favorable to the accused; and (4) that the information was material. *Hutchison v. State*, 118 S.W.3d 720, 736 (Tenn. Crim. App. 2003) (quoting *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995), *as amended on rehearing* (Tenn. July 10, 1995)). Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *State v. Cureton*, 38 S.W.3d 64, 77 (Tenn. Crim. App. 2000) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The defendant has the burden of proving a violation by a preponderance of the evidence. *Edgin*, 902 S.W.2d at 389.

A general request for *Brady* material is sufficient. *Id.* ("Even though Edgin's request for Brady material was general in nature, it was timely made."). Accordingly, the Defendant's motion for exculpatory evidence, which requested "[a]ny evidence which if favorable to the Defendant by tending … to indicate sources of potential impeachment of any witness" was sufficient to satisfy the requirement that the Defendant request the evidence. Furthermore, evidence which could impeach a witness for the State is deemed exculpatory. *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001).

The rule in *Brady* applies "not only to evidence in the prosecution's possession, but also to 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014) (quoting *Strickler v. Greene,* 527 U.S. 263, 275 n. 12 (1999)). This includes "evidence in police possession which is not turned over to the prosecution." *Id.* The prosecution is not, however, under a duty to disclose information that the accused either possesses or is able to obtain. *Johnson*, 38 S.W.3d at 56. In order to show materiality, the Defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Edgin*, 902 S.W.2d at 390.

The Defendant testified at trial that the police took his telephone for the purpose of extracting evidence, in particular pictures of the victim, when he was arrested and that he "suppos[ed]" that the telephone was not put with his personal property but was put into

the evidence room.  He testified that if Sergeant Griffin testified that the police did not take his telephone or collect it as evidence, then Sergeant Griffin would be lying. Sergeant Griffin never gave testimony regarding the telephone.  At the motion for a new trial, however, trial counsel acknowledged that co-counsel visited the Property and Evidence Room in an effort to locate the telephone and was unable to do so.  Trial counsel also issued a subpoena without any results.  The prosecutor stated that the cellular telephone had never been in the possession of the State.  The trial court made no factual findings at the motion for a new trial, simply denying the motion in toto without analysis.  We conclude that the Defendant has not shown by a preponderance of the evidence that the State possessed the telephone or suppressed the evidence.  The record here simply does not establish by a preponderance of the evidence that the telephone was in the possession of law enforcement.

Neither has the Defendant shown materiality.  The victim's testimony regarding the photographs was not elicited by the State but was volunteered in response to the prosecutor's question regarding whether the Defendant spoke to the victim the night of the party.  The State did not elicit further details regarding the event, and the Defendant did not object to the testimony.  The Defendant then testified that he did not take pictures of the victim and that police took his telephone into evidence at the time of his arrest the next day.  The Defendant contends that, had the State made the cellular telephone available in discovery, the telephone would have shown an absence of photographs of the victim and that this circumstance would have tended to show his innocence.  However, the Defendant introduced evidence that there were no photographs of the victim on his telephone through his testimony.  The Defendant did not avail himself of the opportunity to question Sergeant Griffin regarding the telephone or its contents.  The Defendant was presumably aware of the existence of the telephone and its contents prior to trial but did not seek to obtain or introduce the evidence. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").  Moreover, an absence of photographs on the telephone would not establish that no photographs were taken, given the lapse of time between the event and the Defendant's arrest.  Furthermore, evidence regarding photographs taken in 2011 does not bear directly on the crime with which the Defendant was charged, rape of a child occurring in 2010.  Accordingly, there is no reasonable probability that a disclosure of any evidence would have led to a different result at trial.

## VIII. Cumulative Error

In the section of his brief addressing the sufficiency of the evidence, the Defendant also argues that he is entitled to relief under the doctrine of cumulative error.  Because the Defendant has not demonstrated error, he is not entitled to relief for cumulative error.

*State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) (holding that cumulative error is only applicable where there is more than one error committed at trial).

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE